ELI BINGAMAN, APPELLEE, V. ANNA BINGAMAN ET AL.,
APPELLANTS.

FILED OCTOBER 22, 1909.   No. 15,776.

1. **Evidence, Preponderance of.** While it is the rule in this state that a preponderance of the testimony is all that is required to sustain a finding in a civil case, still what constitutes a preponderance may vary largely according to the circumstances of each case.

2. **Cancelation of Instruments:** PRESUMPTIONS: EVIDENCE: FRAUD. Where it is sought to set aside a written instrument, and more especially one which has been executed with the formality of being signed in the presence of witnesses and acknowledged before a notary public, on account of fraud, the presumptions of validity and regularity attaching to such a document require clear and convincing evidence to preponderate against them. The formal instrument furnishes proof of the most cogent and solemn character, and to outweigh this proof requires a greater quantum of evidence than in a case where there are no such presumptions to overcome. *Peterson v. Estate of Bauer,* 76 Neb. 652, 661.

APPEAL from the district court for Saline county: LESLIE G. HURD, JUDGE. *Reversed with directions.*

*E. J. Clements* and *J. H. Grimm & Son,* for appellants.

*Hastings & Ireland, contra.*

LETTON, J.

This is a case to set aside and cancel a conveyance of 80 acres of land in Saline county on the ground that it was fraudulently obtained. The plaintiff and defendant are husband and wife. The plaintiff is a man 68 years of age. In 1865 he entered 160 acres of land in Saline county under the United States homestead law, of which tract the 80 acres in controversy form a part. In 1882 plaintiff,

who was a widower with one son, lived upon his home-stead, and the defendant Anna Bingaman at that time was living on her farm near-by. She was then a young widow named Chyba, 24 years old, with several children. They were married in 1882, and lived together upon the plaintiff's homestead for 13 years, when, the health of both failing, they went to Texas, and have lived at various places in the south from that time until a short time be-fore the beginning of this action; both, however, looking upon plaintiff's 160-acre farm as their family homestead, and living upon the rents derived from that land, the rent from 160 acres owned by the defendant, and from the plaintiff's pension of $12 a month. The testimony shows that their married life was full of discord and quarrels, although they had their peaceful intervals as well; and that they had separated and lived together again. When Mrs. Chyba married the plaintiff and moved to his home, the house was built upon the farm and the orchard planted, but most of the other improvements have been made since that time, a number of them from the income from the rent.

The defendant testifies that before the marriage of Bingaman, as an inducement to her to marry him, he promised to convey to her the 80 acres in controversy, but this is denied by the plaintiff. They both testify that soon after the marriage, and continuing for a long time, she kept insisting that he make her a conveyance of the land, but that he as regularly refused to do so. She finally be-came tired, she says, and stopped asking him to carry out this alleged agreement, until in 1906, after the plaintiff's only son had been killed in a railroad wreck, she again began to urge him to make the conveyance. They spent the summer of 1906 at Crete near the farm; during that summer she advertised 80 acres of her land in section 4 for sale. Upon one occasion the plaintiff accompanied her to the office of one James Schmelir, a notary public, in Crete. She testifies that at that time Schmelir wrote the deed conveying the 80 acres to her son James Chyba for

the purpose of transferring the title to her; that at this time she offered to pay plaintiff $500 if he would execute the deed; that it was read to him by Schmelir, but that he became angry, refused to make the deed, and said to her: "You will get it, not now, but soon." The plaintiff admits substantially that this conversation was had, but testifies that the deed was not read to him, and that he did not see it then. In the fall of that year they returned to Hot Springs, Arkansas. . After they went south the unexecuted deed was sent by Schmelir to the defendant, and the evidence shows that the plaintiff was aware of this fact.

The plaintiff's story as to what afterwards occurred is about as follows: That defendant told him she wanted him to join with her in making a deed to her son of the 80 acres of her land in section 4 that she had been trying to sell while they were in Nebraska; that on the morning of November 23, 1906, she induced him to go to the office of a notary in that city for the purpose of signing and acknowledging the deed; that she read the deed to him before they went to the notary's office as if the land was in section 4, the N. W. of the S. W. ¼ of section 4; that when they went to the notary's office that officer read it over again just the same as she did, as if the land was in section 4; that no consideration was paid for his signature; that there was no one in the office at the time but he and his wife and another woman; that a Mr. Lafevre came in, in response to a telephone call, and signed the deed as a witness, though he also says that they left before Lafevre came; that his wife told him she was selling the land for $5,000, and was going to divide this up between her children and herself, and that, as she read it to him, the consideration named was $5,000. He further testifies that he did not know that his land had been conveyed until a lease was sent from one Eckert, a real estate agent at Crete who had found a tenant, and the lease was in Mrs. Bingaman's name; that he first had his wife write, and that Mr. Eckert said it was all right, but that afterwards

he had a lawyer write Eckert, but Eckert would not answer; that he soon afterwards received a newspaper clipping showing the deed had been filed for record, and that this was the first definite knowledge he had that the land had been transferred; that his wife then had $200 of his money, but that he could not get any money from her, but waited till he got his pension, when he came to Crete, and began this action in November, 1907; that the rent for 1906 and 1907 has been collected and paid to him, the 1907 rent being paid him by John Chyba, his wife's son; that he is unable to read writing, although he can write his name, and is unable to read the English language, except to pick out a few words when he reads a newspaper; that he has paid the taxes from the rent money, and is now in possession of the land.

On the other hand, the defendant's story is: That on the day before the deed was executed she had been urging him to carry out his promise and deed her the 80 acres; that she told him she would pay him the $500 which she promised in Schmelir's office; that he said he would consider it until next day; that in the morning he said he had made up his mind that he would let her have it. She also says she agreed that the land should not be sold so long as he lived. That they went to a butcher shop that morning, and asked the proprietor, Mr. Lafevre, with whom they were both acquainted, whether he would witness the deed; that after dinner they went down town to look for a notary; that they saw Mr. Alford's sign, went into the office, and asked him to acknowledge the deed; that he then asked whether they knew some one who could identify them; that they told him of Mr. Lafevre, and Mr. Alford then telephoned him to come down for the purpose of witnessing the deed; that before they left home the plaintiff asked her to read the deed aloud, which she did; that Mr. Alford again read the deed aloud to them before Lafevre came in, and that after Lafevre came in the deed was again read aloud by him, and then signed, witnessed, acknowledged and delivered to her; that the next day she

gave plaintiff five $100 bills from her cash box, money received from rents; that the deed was afterwards recorded, but not until she had procured a reconveyance to her from her son John, and this was the reason for the delay in recording. She further says that she had never met Mr. Alford before, and that her only acquaintance with Lafevre was from purchasing meat at his butcher shop. She agrees with plaintiff that they had to wait about one-half hour for Mr. Lafevre to come, because his clerk was out, and he could not leave his shop, and further says that she had never had any conversation with Alford, except at that time in her husband's presence. Her testimony in regard to the transaction in the office is corroborated both by Mr. Alford and by Mr. Lafevre. These men both identify the original deed, which was offered in evidence, testify that it is unaltered, and each testifies that he read the description aloud to both of them exactly as it was written in the deed, although they could not tell from memory alone what section the land was in.

In rebuttal, the plaintiff again denied being paid any money for the land, and said that it was his wife who asked that Lafevre be sent for. He denies the making of an agreement that she should not sell the land as long as he lived. Plaintiff also in rebuttal offered the testimony of Mr. and Mrs. Lowrey, who had associated somewhat intimately with the parties when they lived at Hot Springs and Little Rock, Arkansas. Lowrey testified that in October, 1907, defendant, told him her husband had found out about the land being deeded away, and he accused her of fooling him out of the land; that she further said that she had taken advice, and that her attorneys said no payment was necessary, and that her title was good without it. But Lowrey also testifies that he frequently heard defendant say to the plaintiff that he ought to deed the land to her as a recompense, and his response was: "Do you want me to die? You will get the land some time"— and that these conversations were between the 15th and the last of October, 1907. His wife testifies that in July,

1907, defendant told her that she had been trying to get her husband to deed 80 acres of land to her, and that he always says, "Do you want me to die?" That she also said that Bingaman gave her some land when they were in Hot Springs a year ago, and that he now says, "I fooled him, that he did not give it to me." This evidence, however, is subject to the same infirmity that inheres in all testimony of the kind.

The original deed is in the record and bears no traces of any change or alteration in the description of the section. Schmelir, who wrote the body of it, is dead, and his testimony has not been taken. It is possible that the plaintiff's story of the fraud perpetrated upon him by his wife and by the notary is true, but we think the evidence is overwhelmingly against him on this point. There is absolutely nothing in the record which tends to cast any sinister light upon the conduct of either Alford or Lavre, and both appear to be entirely disinterested witnesses.

While it is the rule in this state that a preponderance of the testimony is all that is required to sustain a finding in a civil case, still what constitutes a preponderance may vary largely according to the circumstances of each case. Where it is sought to set aside a written instrument, and more especially one which has been executed with the formality of being signed in the presence of witnesses and acknowledged before a notary public, the presumptions of validity and regularity attaching to such a document require clear and convincing evidence to preponderate against them. The formal instrument furnishes proof of the most cogent and solemn character, and to outweigh this proof requires a greater quantum of evidence than in a case where there are no such presumptions to overcome. *Peterson v. Estate of Bauer*, 76 Neb. 652, 661; *Doane v. Dunham*, 64 Neb. 135; *Topping v. Jeanette*, 64 Neb. 834; *Williams v. Miles*, 68 Neb. 463.

The plaintiff's main contention is that, while the deed upon its face describes the plaintiff's land in section 3, yet

it was read to him as if it described the defendant's land in section 4, but this is denied by the defendant, by the notary and by the witness, and there is absolutely no evidence in the record which even remotely suggests any collusion or conspiracy or any concert of action between these parties.

With the exception of the testimony of the plaintiff and defendant, that relating to the transactions at the time of the execution of the deed, and to conversations thereafter in Arkansas, was taken by deposition. The advantage, therefore, that personal observation of the witnesses usually gives to the trial judge does not exist as to these absent witnesses, and this court is in as favorable a position to judge of their credibility as was the trial court. We must refuse to cancel and set aside this conveyance upon this testimony; but, while we cannot grant the plaintiff all the relief he asks for, there is a general prayer for equitable relief in his petition.

The defendant testifies that, according to her agreement with the plaintiff, the land was not to be sold until after his death, and we think her conduct since the conveyance bears this out. The rent collected by her son since the conveyance has been paid to the plaintiff, and she has never been in actual possession, claiming in opposition to his right to the rents and profits. We are of the opinion from the evidence that plaintiff never intended to part with the possession or use of his land so long as he lived, and that the conveyance, while absolute in its terms, was not intended to give to the defendant the whole estate until after the plaintiff's death. He testifies he never meant to part with the land while he lived; and, while he denies making the agreement, the record as a whole convinces us that in all probability the deed was made in recognition of an invalid antenuptial agreement and upon her admitted promise. The son took title only as an intermediary; hence, the agreement was not effected by the deed to him. We are of the opinion that the right of possession of the plaintiff during his lifetime should be pro-

tected by the court, even though he has failed to pray specifically for such relief.

For these reasons, the judgment of the district court is reversed and the cause remanded, with instructions to that court to enter a decree finding and declaring that the plaintiff, or his grantees or assigns, is entitled to the occupancy and possession of the land described in the conveyance for and during the term of his natural life, subject, however, to the usual obligations of a tenant for life; and, as to other matters, finding for the defendant.

JUDGMENT ACCORDINGLY.