OSMAN INGRAHAM, APPELLANT, V. FRANK HUNT ET AL., APPELLEES.

. 68 N. W. 2d 344

Filed February 11, 1955.   No. 33601.

*Jack H. Hendrix* and *Russell & Colfer,* for appellant.

*Carlyn G. Wolfe* and *Hines & Hines,* for appellees.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Osman Ingraham, brought this action seeking to quiet his title and right to possession of described lands, together with equitable relief, as against defendants Frank Hunt, Faith B. Hunt, John S. Burks, and Clara E. Burks. Defendants Hunt filed an answer and cross-petition denying generally and seeking to have the title to described lands quieted in them, together with injunctive relief as against plaintiff. Defendants Burks, who were tenants of the Hunts, answered, denying generally. Subsequently the issues were completed by plaintiff's replies and answer to defendants' cross-petition.

After a pre-trial hearing, the cause was tried upon the merits and a judgment was rendered, finding and adjudging the issues generally against plaintiff on his petition and in favor of defendants Hunt on their cross-petition. Plaintiff's motion for new trial was overruled and he appealed, assigning substantially that the judgment was not sustained by the evidence but was contrary thereto and contrary to law. Upon trial de novo under elementary rules with relation thereto, we sustain the assignment.

The record discloses that prior to February 25, 1943, plaintiff was the owner of farm lands which for clarity and brevity will be called tract No. 1 and tract No. 2. Tract No. 1 is the south half of Section 20, and Lots 1, 2, 3, and 4, in Section 29, all in Township 2 North, Range 35 West of the 6th P. M., in Hitchcock County. Tract No. 2 is the north half of the southeast quarter and the northeast quarter of the southwest quarter, and Lots 5, 6, 7, and 8, all located in Section 29, Township 2 North, Range 35 West of the 6th P. M., in Hitchcock County.

The original government survey made in 1872 established the Republican River as the boundary between the two tracts. Tract No. 1 was on the north side with Lots 1, 2, 3, and 4 thereof adjacent to the river. Tract No. 2 was on the south side, with Lots 5, 6, 7, and 8 ad-

jacent to the river. At the time of the transaction here involved, which was initiated and concluded entirely by correspondence, plaintiff lived in San Bernardino, California, and defendants Hunt, who inferred that they were ignorant of legal transactions and proceedings, lived in Bremerton, Washington. However, defendant Frank Hunt formerly lived near the land involved and admittedly had been familiar with it for about 50 years.

The evidence relating to the transaction was not in dispute. William C. Dahnke, a licensed real estate broker for many years, lived in Stratton, Nebraska. He was plaintiff's agent, having power of attorney to manage his real estate in Hitchcock County. While acting in such capacity he corresponded at length with defendant Frank Hunt, with whom he was well acquainted, and received replies thereto. Only such parts of that correspondence as we deem important and controlling will be recited herein.

In that connection, on February 11, 1943, Dahnke wrote an airmail letter to defendant Frank Hunt saying: "In a letter from the Ingrahams this morning they advise that they will sell their land (the old Wolfe Ranch) south of the river for $2000.00, * * *. And of course it is understood that this is to be a cash consideration.

"Before I can proceed very far in this matter if (sic) will be necessary that I hear from you, and in case you report favorably, it must be understood that it may take some little time to work this out for it will undoubtedly take considerable correspondence and time since they live in California and you in Washington. * * *

"This land has an oil and mineral lease on it and it is their desire to retain a one half interest in any future royalties that may accrue."

On February 13, 1943, defendant Frank Hunt answered by airmail saying: "Received your letter in regard to the land known as the Wolfe place I could use that south of the river but not at more than $1500. cash I would want the oil lease rent, of 10 cents an acre, but

would give them ½ of oil royalties for the next five years, in case oil is found, but would want it on a contract, not on the deed. *Allso (sic) I would want the land measured to center of river bed and that line to stand which ever way the river changed, because it could go back north very nearly to their north line or could come south where it cut though (sic) dureing (sic) the flood, so that line as it stand now would be fair to both partyes.* (sic) Now if they want to sell for $1500. cash I would be willing to post a $500. check with the Stratton Bank, to make them safe to go ahead and buy other land, but we want to hurry along as I am trying to deal for other land. * * * Hopeing (sic) we can deal on this land I wish to remain * * *." (Italics supplied.)

On February 17, 1943, Dahnke replied, saying: "Your letter of February 13, 1943 duly received relative to the purchase of the Ingraham land south the river west of Stratton, Nebraska, and I have been working fast since time is relatively short, and both parties now apparently in a hurry to know just where they are at in this matter. So we will try to make a deal and to get it closed, if at all possible, by March 1, 1943.

"To try to expedite matters I am doing something unusual and something that I have never done before in my numerous years of business. I have drawn a contract before the terms and consideration have been agreed upon, and which I now submit herewith subject to your approval, and for your signature and the wittnessing (sic) of same if approved. This to include your wife too if she is to be a party in the deal. In that case her name to be inserted.

"Your offer on the land was not accepted but this tendered agreement in (sic) a compromise, so to speak, between what the Ingrahams asked and your offer. It seems to me that this is fair to both parties but now it is entirely up to you to decide. * * *

"The deed and descriptions will be in accordance to the Abstract of Title covering this land and the Govern-

ment Survey thereon, and to indicate this to you I have drawn a copy of a Plat showing the Government Survey and the acreage. Think you will find this self-explanatory and satisfactory. In other words they will deed just what they received as the Abstract of Title discloses. The river itself of course belongs to the Government and the tracts adjoining it are surveyed and laid out in lots. On the drawing I have shown the number and acerage (sic) in each lot. The total acerage (sic) amounts to 245.8 acres. * * * I have authority to sign for the Ingrahams or if you want it I can have them sign the contracts personally. But of course first it is for you to approve. Then execute if you do approve." The enclosed hand-drawn plat correctly portrayed the approximate location of the river and plaintiff's land on both sides thereof according to the government survey of 1872. It recited specifically that there were 54.6 acres in Lot 5, 21 acres in Lot 6, 22.4 acres in Lot 7, 27.8 acres in Lot 8, together with 80 acres in the north half of the southeast quarter and 40 acres in the northeast quarter of the southwest quarter, or a total of 245.8 acres in tract No. 2 as heretofore described. Further, the enclosed agreement for sale and purchase thereof, dated February 17, 1943, and made in duplicate, contained the name of Faith B. Hunt written in by defendants as suggested in Dahnke's letter, and specifically described the land as: "The North Half of the southest (sic) Quarter; the Northeast Quarter of the Southwest Quarter; Lots 5, 6, 7, and 8, (Containing 246 acres, more or less, according to Gov. survey) of Section 29, Town 2 N., Range 35 West, in Hitchcock County, Nebraska." It recited the consideration to be paid therefor by defendants as $1,750, to be paid $500 in cash and $1,250 on or before March 1, 1943, or as soon thereafter as warranty deed and merchantable abstract of title could be furnished. As suggested by defendants, the Commercial Bank of Stratton was designated therein to act as escrow agent

and depository through which the agreement was to be closed.

Defendants Hunt signed the agreements, and on February 20, 1943, defendants Hunt wrote Dahnke airmail saying: "Am returning contracts with a five hundred $ check. I want this under stood that seventeen hundred and fifty dollars is all the money that this land is going to cost us. In making this deed, have it made to a joint deed to both of us. The land to go to the surviver (sic). If in case this deal falls thru with I expect you to return our check. Also five years on the oil royalty."

The agreement aforesaid was signed by Dahnke as agent for plaintiff and his wife, and on February 23, 1943, Dahnke wrote to defendant Frank Hunt saying: "Herewith inclosed your copy of the Real Estate Sale agreement which was duly received from you and your wife together with your $500.00 check as down payment on the contract.

"Joint Tenancy warranty deed, with title to go to survivor, was drawn yesterday and sent on its way to California for execution and abstracts of title sent to Trenton for continuation and certification down to date. Will you want these sent to you for examination and inspection or do you desire some one out here to attend to this for you. I should get them back from Trenton within a day or two.

"The separate contract which you asked covering the payment of one half any accrueing (sic) Oil and Gas royalties for a period of one year in (sic) also enclosed herewith. I have also signed the agreement in duplicate for the Ingrahams and if it is approved and satisfactory with you, you and your wife kindly sign same, and have your signatures wittnessed (sic) at least by one person. On second thought I beleive (sic) you should really have your signatures acknowledged before a Notary Public since you are the principals in this agreement, and it may really turn out to be a very valuable document within the 5 year period. You know there

is a possibility of drilling for oil out that way some time within the near future. So please have it notarized and oblige. Let us do this all in a business way. That is the way all your papers will come to you. The original copy is for the Ingrahams and you may retain the Duplicate for your files. * * *

"The deed will be placed in Escrow in the Commercial Bank when it is returned here and you will be promptly advised of same so that you can send your final payment there and we can make the exchange of papers thru the bank. But advise me about the abstract of title."

The enclosed 5-year supplemental oil royalty agreement, dated February 22, 1943, which agreement specifically described the land as heretofore set forth in the other agreement, was duly signed and acknowledged by defendants Hunt on February 25, 1943, who kept the duplicate thereof and returned the original to Dahnke.

Again, on March 1, 1943, Dahnke wrote defendant Frank Hunt saying: "The Oil Royalty agreement re-received from you yesterday; also the executed deed from California. Even though you have not made the final payment on the contract in the amount of $1250.00 I am sending the deed herewith for your inspection. I called the bank and they reported that you had not yet made arrangements for this payment but I am going to trust you as you are willing and have been trusting me. * * *

"Yes, You get possession of this pasture as of March 1st, which is today, and which is in conformity with the sale agreement. * * *

"As a token I am sending you a pocket map of Hitchcock county and am sure you will enjoy it, and feel that it will be of some value to you. This map was made up by an oil company some four years or so ago and shows the current of the river as it was then. After the flood the channel had changed in many places and now it is again about back to where it was before the flood and in or near the old channel. * * * I have marked in

red as near as I can determine about where the main channel now runs."

The enclosed warranty deed had been duly executed by plaintiff and his wife on February 25, 1943, and it also specifically described the property sold to defendants as: "The North Half of the Southeast Quarter (N½ SE¼); The Northeast Quarter of the Southwest Quarter (NE¼ SW¼); and Lots 5, 6, 7, and 8; all located in Section Twenty Nine (29), Township Two (2), North, Range Thirty five (35), West of the Sixth Principal Meredian (sic), and containing 246 acres, more or less, according to the Government Survey Thereof." The enclosed pocket map also correctly traced with a red pencil the approximate course of the Republican River during February 1943. Further, defendants received the abstracts of title from Dahnke a week or two after the transaction was completed.

The record discloses that there was little if any change in the channel of the Republican River from the time of the government survey in 1872 until 1935 when a flood suddenly, violently, and visibly, by avulsion, changed its channel some distance toward the north. However, beginning about 1937, its channel began to move back toward the south, until in February 1943, it was at or near the original channel, as represented to defendants Hunt. Then from about 1945 and during the next few years, there were several flash floods which again suddenly, violently, and visibly by avulsion moved the channel of the river far toward the north of the original channel beyond Lots 2, 3, and 4 in Section 29 and into a part of Section 20, until in 1952 some 153.58 acres were left between the new and the old river channel. In 1951 an attempt was made by plaintiff's agent and other interested parties to stop such movement of the river toward the north but defendants Hunt then objected and a dispute arose over the ownership of such land which prompted plaintiff's action herein. It is the title to such 153.58 acres which defendants Hunt claimed

to own and have the right to a decree quieting title in them with injunctive and other equitable relief. In that regard, their theory primarily was that the north boundary of the land conveyed to them in February 1943 was the center of the river in its course after the 1935 flood which allegedly remained in the same location thereafter. They alleged plaintiff's agent inequitably concealed the facts from them and made misrepresentations upon which they relied.

The trial court's judgment in effect sustained that contention and reformed defendants' deed to include not only all of the land as specifically described in defendants' several contracts and warranty deed but also to include in addition "Lots 2, 3 and 4 of Section 29, Township 2, North Range 35; and that part of the South Half of Section 20, Township 2, North Range 35, West of the 6th P. M. lying south of the Republican River as the same now exists." The judgment of the court thus quieted title in defendants Hunt, giving them some 399.38 acres of land instead of 245.8 as originally provided in their agreements and deed.

We decide that the evidence and law will not sustain the trial court's judgment upon any theory. Rather, it is contrary to both. The clear and unequivocal evidence adduced by plaintiff with regard to location of the river channel in February 1943 was in fact corroborated by defendant John S. Burks, a tenant of the land deeded by plaintiff to defendants Hunt. He had been such tenant since March 1, 1943. He had also lived on an adjoining farm 18 years and within a couple of miles of it the last 35 years. In speaking of the river channel, he testified that after the 1935 flood and along in the early 1940s, the channel actually moved back south until "It was about where it was before '35." He was then asked: "Q- The river, of course, meandered, and in some places it might have been near the old channel, and in some places a little ways from it? A- It could be, yes. Q- You have no independent recollection of

where it ran in '43 when you took it over, that is when you took over this land and rented it? A- Yes, I know about where it was. * * * Q- Now, this changing you mentioned, or cutting the river banks, that was after you had flash floods after you went on this land in '43? A- Yes. Q- The river commenced to take a course to the north and cut in considerably? A- The west went north, and the east end went south. Q- And the channel was changed, was it not, by this caving-in process, when you had the flash floods, that condition has been continuous since you went on the place, has it not? A- Yes."

We conclude there was no competent evidence that plaintiff's agent inequitably concealed anything from defendants Hunt or that he made any misrepresentations to them or that there was any actual or constructive fraud or mistake since defendants Hunt received exactly what they purchased and what they wanted as demonstrated by their letter of February 13, 1943, to Dahnke, and their executed agreements and deed. Defendants did not either plead, prove, or rely upon accretion. On the contrary, plaintiff established avulsion without dispute, and as a matter of course avulsion could not change their boundary line. Iowa Railroad Land Co. v. Coulthard, 96 Neb. 607, 148 N. W. 328; Mercurio v. Duncan, 131 Neb. 767, 269 N. W. 901; Conkey v. Knudsen, 141 Neb. 517, 4 N. W. 2d 290, vacated on factual grounds in 143 Neb. 5, 8 N. W. 2d 538.

In Beckius v. Hahn, 114 Neb. 371, 207 N. W. 515, 44 A. L. R. 73, quoted with approval in Kear v. Hausmann, 152 Neb. 512, 41 N. W. 2d 850, it is said: "In equity, the reformation of an instrument has the effect of making it express the real intent of the parties. The rights of the parties are measured by the instrument as originally intended, and the effect of the reformation, as a whole, should be to give all the parties all the rights to which they are equitably entitled under the instrument which they intended to execute."

In Oft v. Ohrt, 128 Neb. 848, 260 N. W. 571, this court held: "A deed to real estate, if it is a conveyance not voluntary, like any other written contract, may be impeached by either party thereto for fraud or mistake, and parol testimony is competent to reform it so as to make it recite the actual agreement between the parties." See, also, Shurtleff v. Pick & Co., 103 Neb. 414, 172 N. W. 46, where we held that: "Equity has jurisdiction to reform a written contract, when there has been a mistake of one party and there has been fraud or other inequitable conduct by the other party in reducing the contract to writing." Further, we held in Neary v. General American Life Ins. Co., 140 Neb. 756, 1 N. W. 2d 908, that: "Equity will decree reformation of a contract only if the mistake is mutual, or for fraud or inequitable conduct."

However, such foregoing general rules are applicable and controlling only in cases wherein fraud or mistake of fact has been appropriately established, which defendants failed to do in the case at bar. In that regard, in Meyer v. Schmidt, 135 Neb. 850, 284 N. W. 337, this court held: " 'There is no fraud where there is nothing wrong, and fraud cannot be deduced or inferred from that which the law pronounces honest.' 12 R. C. L. 237, sec. 8.

"The mere fact that a person is unlearned, and ignorant of legal proceedings, affords no ground for relief in equity, unless the person against whom relief is sought misrepresented the facts to him."

Also, in Du Teau Co. v. New Hampshire Fire Ins. Co., 156 Neb. 690, 57 N. W. 2d 663, involving alleged mistake, we held: "In an action for reformation of a written instrument, the burden rests upon the moving party of overcoming the strong presumption arising from the terms of the written instrument. If the proofs are doubtful and unsatisfactory and if there is a failure to overcome this presumption by testimony entirely plain and convincing beyond reasonable controversy, the writ-

ing will be held to express correctly the intention of the parties." See, also, Lovenburg v. Justice, 155 Neb. 406, 51 N. W. 2d 895.

Generally, upon the execution, delivery, and acceptance of an unambiguous deed, such being the final acts of the parties expressing the terms of their agreement with reference to the subject matter, all prior negotiations and agreements are deemed merged therein, in the absence of a preponderance of evidence clear and convincing in character establishing some recognized exception such as fraud or mistake of fact, and the deed will be held to truly express the intentions of the parties. 32 C. J. S., Evidence, § 913, p. 835; 16 Am. Jur., Deeds, § 445, p. 686; Gray v. Van Gordon, 187 Iowa 835, 174 N. W. 588; Neihart v. Ingraham, 140 Neb. 818, 2 N. W. 2d 28; Bingaman v. Bingaman, 85 Neb. 248, 122 N. W. 981, cited and quoted from with approval in Cunningham v. Brewer, 144 Neb. 211, 13 N. W. 2d 113. Such rules are particularly applicable and controlling here.

Other matters are discussed in briefs of counsel but they require no discussion. For reasons heretofore set forth, the judgment of the trial court should be and hereby is reversed, and the cause is remanded with directions to render judgment for plaintiff upon his petition and against defendants Hunt upon their cross-petition, in conformity with this opinion. All costs are taxed to defendants Hunt.

REVERSED AND REMANDED WITH DIRECTIONS