DARTMOUTH COLLEGE, A CORPORATION, APPELLEE, V. GERALD ROSE ET AL., APPELLANTS, IMPLEADED WITH RALPH ROPKEN ET AL., APPELLEES.

112 N. W. 2d 256

Filed December 1, 1961. No. 34979.

*Cecil W. Orton* and *Kindig, Beebe & McCluhan,* for appellants.

*Smith & Smith* and *Woods, Fuller, Schultz & Smith,* for appellee.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

MESSMORE, J.

This is an action in equity brought on July 28, 1959, by Dartmouth College, a corporation, against the defendants Gerald Rose and Gloria Rose, husband and wife, Lawrence Harris and Rosetta Harris, husband and wife, and Ralph Ropken and Betty Ropken, husband and wife. The purpose of this action was to quiet title to certain real estate described in the plaintiff's petition against all of the defendants, and to enjoin them from setting up or asserting any interest in, right or title to, or lien upon said real estate or any portion thereof. The defendants Ralph Ropken and Betty Ropken, husband and wife, filed a disclaimer of any right, title, or interest in the real estate here involved. The trial court rendered judgment quieting title in the plaintiff to certain lands as described in the plaintiff's petition, and enjoined the defendants from asserting any claim or interest in said

real estate. The court also determined that the dispute in question was confined to the land lying directly east of the plaintiff's land, since a portion of the land in dispute lies within the State of Iowa and beyond the jurisdiction of the district court for Dakota County, Nebraska. The defendants filed a motion for new trial which was overruled. The defendants appeal.

The plaintiff's petition alleged that the plaintiff is the owner by title in fee to certain real estate situated in Township 27 North, Range 9 East of the 6th P. M., in Dakota County, Nebraska. The petition further alleged that the plaintiff and its predecessors in title have had open, notorious, continuous, and exclusive adverse possession of said real estate under claim of title thereto for more than 10 years last past; that Leon E. Williams acquired title to this real estate by deed on February 13, 1948; that he died testate May 26, 1958; that by his will, which was duly admitted to probate December 6, 1958, he devised all of the real estate in Dakota County of which he died seized to the plaintiff; and that none of said defendants have any valid or legal ownership of, interest in, right or title to, or lien upon said real estate, or any part thereof, but their apparent claims cast a cloud upon the plaintiff's title which should be removed.

The defendants, except the defendants Ropken, admit that part of paragraph 5 of the plaintiff's petition alleging that these answering defendants claim some interest in, right or title to, or lien upon the real estate described in the plaintiff's petition, and deny every other allegation therein.

By cross-petition these defendants alleged that they are the owners of the real estate known as Omi Island in the Missouri River, then the description of the real estate which they claim to own is set forth; that these defendants have been in continuous, open, notorious, exclusive, and adverse possession of the lands therein described which are situated in Woodbury County, Iowa,

and Dakota County, Nebraska, under claim, and have occupied every part of said property, claiming the same as their own, clearing and improving the same, and have claimed adversely to any and all interests of the plaintiff and all other persons, and against the whole world for more than 10 years last past; and that they are now in possession of the same. The prayer is that their right, title, and interest in and to said described real estate, including all accretions thereto, be found and determined to be in these defendants and cross-petitioners, and that they have title quieted in them to said land.

The trial court quieted and confirmed title in Dartmouth College as against each and every one of the defendants named herein to the following described real estate situated in Township 27 North, Range 9 East of the 6th P. M.: Government Lots 4 and 5, Section 15, and all accretion lands thereunto belonging; Lot 6, Section 15, as located and established by survey and plat of R. V. Fairchild, civil engineer, in the year 1930, and approved by the board of county commissioners of Dakota County, Nebraska, and all accretion lands thereunto belonging; Government Lots 1, 2, 3, and 7, Section 22, and all accretion lands thereunto belonging; Lots 8 and 9, Section 22, as located and established by survey and plat of R. V. Fairchild, civil engineer, in the year 1930, and approved by the board of county commissioners of Dakota County, Nebraska, and all accretion lands thereunto belonging; all accretion lands belonging to Government Lot 5 and to Government Lot 6, Section 22; the south 16 acres of Government Lot 1, and all of Government Lot 2, Section 16, and all accretion lands thereunto belonging; Lot 3, Section 16, as located and established by survey and plat of R. V. Fairchild, civil engineer, in the year 1930, and approved by the board of county commissioners of Dakota County, Nebraska, and all accretion lands thereunto belonging; Government Lots 1 and 2, Section 21, and all accretion lands thereunto belonging; Lot 9, Section 21, as located and estab-

lished by survey and plat of R. V. Fairchild, civil engineer, in the year 1930, and approved by the board of county commissioners of Dakota County, Nebraska, and all accretion lands thereunto belonging; and the south half of the southwest quarter of Section 16, and all accretion lands thereunto belonging.

The real estate, all situated in Township 27 North, Range 9 East of the 6th P. M. (except the south half of the southwest quarter of Section 16), is also described as follows: Commencing at the northwest corner of Lot 5 in Section 15, thence due east along the north line of said Lot 5, and the centerline of said Section 15, extended to the state boundary line, between the states of Iowa and Nebraska, as set forth in the Iowa-Nebraska Boundary Compact ratified by Nebraska on May 7, 1943, and being the centerline or middle of the former proposed stabilized channel of the Missouri River, as established by the United States Engineer's office, Omaha, Nebraska, and shown on the alluvial plain maps of the Missouri River, from Sioux City, Iowa, to Rulo, Nebraska, which maps are now on file in the United States Engineer's office at Omaha, Nebraska, and copies of which maps are now on file with the Secretaries of State of the States of Iowa and Nebraska; said boundary line also being shown on exhibits Nos. 24 and 25 in this cause; thence southerly, on the centerline of said proposed channel and state line, to its intersection with the south line of Section 22, extended; thence due west, along the south line of said Section 22, extended, to the southwest corner of said Government Lot 7, in said Section 22; thence due north, along the west line of said Government Lot 7, in said Section 22, a distance of 1,745 feet; thence south, 80° west, a distance of 2,615 feet to the west line of Lot 5, Section 22; thence due north, along the west line of said Government Lot 5, in said Section 22, extended, 990 feet; thence south, 82° west, for a distance of 3,902 feet; thence north 65° west, for a distance of 1,300 feet; thence north, 3° east, for a

distance of 1,865 feet; thence due east for a distance of 1,052 feet; thence due north for a distance of 1,220 feet, to the government meander corner on the north line of Section 21; thence north along the west line of Lot 2, Section 16 to the northwest corner of said Lot 2, in said Section 16; thence east along the north line of Lot 2, extended, in Section 16 to the southwest corner of Lot 5 in Section 15; thence north, along the west line of said Lot 5, Section 15, to the place of beginning; together with all accretion lands thereto and thereunto belonging.

Assignments of error necessary to a determination of this appeal may be summarized as follows: The decision of the trial court is not sustained by the evidence and is contrary to law.

Leon E. Williams acquired the land as set forth in the plaintiff's petition from the Independent Stock Farm, a corporation, by warranty deed on February 13, 1948. The title to this land is shown to have been quieted in the plaintiff's predecessors in interest in 1933, in the case of Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647. Title was quieted in the plaintiff's predecessors to the parcel of land extending from the northwest corner of Lot 5, Section 15, Township 27 North, Range 9 East of the 6th P. M., east along the north line of said Lot 5 (the centerline of Section 15) extended, to the right bank of the Missouri River, thence southeasterly along the right bank of the Missouri River to its intersection with the south line of Section 22, Township 27 North, Range 9, extended eastward to the river bank, thence west along the extended south line of Section 22 to rejoin the south line of plaintiff's government survey land. In 1933, it was adjudged that the title to this parcel of land extended to the right bank of the Missouri River along its full frontage. In the district court for Dakota County a decree was rendered similar to the foregoing, describing the same boundaries, quieting title against other and unknown persons, and

entered in the trial court's journal December 6, 1938.

The course of the river is shown in exhibit No. 16, wherein it is stated that Omaha Creek did not run across this accretion land until long after it came into existence. At all times the north and south boundaries of the subject land have been extensions of the lines of the United States government survey as appears from this decree.

The plaintiff became the owner of this land by virtue of a devise in the will of Leon E. Williams, deceased, which was duly admitted to probate.

It was stipulated that the lands in dispute are those lying east and north of Omaha Creek as it presently flows, and said lands are river-made lands formed gradually by accretion or reliction, and not by avulsion, it being understood that the defendants do not concede that said lands are accretion to the lands of the plaintiff not in dispute.

It is the plaintiff's claim that the accretion is to its land, while the defendants contend the accretion is to what they call Omi Island, which they claim by adverse possession. The plaintiff disputes the fact that there is an Omi Island. It appears that what is called Omi Island contains 1,063.42 acres.

The plaintiff made a prima facie case by the evidence of John Laros, an engineer who made a survey of the lands involved in this litigation in 1958 and prepared a plat. He testified that the plat was drawn to scale; that the distances were correct and the lines drawn thereon were to scale; that the location of Omaha Creek was correct on the north and south where it intersects the boundary line; that the high land is as shown at the north and south boundary line; that the soil that lies east of Omaha Creek is a sandy soil and below the bank there are sandbars; and that above the high bank there is some black soil that is called "alluvial" soil, and some that might be called "river wash."

An exhibit in evidence discloses, as well as does ex-

hibit No. 1, the course of Omaha Creek which apparently entered on the north tip of what is referred to as Omi Island and flows on the west side of what is referred to as Omi Island and allegedly separates the island from the mainland. There is no dispute but that the mainland, as we refer to it in this case, is owned by the plaintiff. Exhibit No. 1 has been examined, and it is deemed unnecessary to point out the findings of the engineer who prepared this exhibit.

When Leon E. Williams owned what has been called the Independent Stock Farm, he named it the Diamond A Ranch.

Duane Jenkins testified that he lived near the Independent Stock Farm in 1948, 1950, 1951, 1952, and 1953; that in 1950 he and another person hunted on Omi Island and were unable to go very far on account of the brush; that in the winter of 1950 and 1951, and later on in that year, he and others started dragging piling off the island; that he and others covered the so-called island to the north, east, and south of Omaha Creek wherever they could get through; that Ivan Krumwiede loaned him a tractor to use on the island; that their purpose in going on the island was to drag piling; that Bud Morrow was also dragging piling with a team; that during the time he and others were on the island there was no farming done; that Bud Morrow was there and lived in a tent which was the only habitation on the island; that in the spring of 1951, he and Ralph Ropken broke some land and farmed by planting roughly 40 acres of corn and a few melons; that he was out there off and on with Ralph Ropken until the crops were harvested, and they were the only ones on the island; that he saw no fences on the island, and he was over all of it in 1950 and 1951; and that Lawrence Harris was on the island and did not order this witness off.

On cross-examination this witness testified that the island was comprised generally of willows; that there were open spots of sand in various places, and new parts

were formed on the north; that there was white sand north of where they farmed; that possibly 50 or 100 people knew that he and Ralph Ropken were farming on that land; and that people came there fishing all the time.

The defendants adduced evidence in substance as follows:

Lawrence Harris, hereinafter referred to as Harris, testified that he was on Omi Island first in July 1940, when he went there to fish; that he was on the island in 1941 to hunt and fish; that the next time he went on the island was in 1946; and that at that time he cut willows, planted a garden, and built a little dwelling using willows, boards, and driftwood. In 1946 he worked for Ivan Krumwiede off and on, and when he was off work, on Sundays and rainy days, he would go over to the island. He also spent some nights on the island. He dug a well and hunted on the island in 1946. He further testified that there were other persons on the island at that time who were fishing. He also saw Gerald Rose who had a fishing camp on the island, some cooking utensils, some decoys, and fishing lines. He saw Rose doing some clearing. This witness further testified that he was on the island in 1947, for the purpose of pulling some piling along the edge of the chute that comes out of the river. In 1947 he planted some corn, squash, pumpkins, and watermelons. In November or December of that year, when the ice was frozen strong enough to hold him, he went over to the island to trap coyotes. He cleared about 9 acres of land on the island in 1947. In 1947 he was on the island once every 2 or 3 days, and also at night. Another shack was constructed of driftwood and some willow poles. There was very little corn, and it was picked by hand. After the corn was picked he started to build a fence, and a "no trespassing" sign was put up. The fence was a two-strand barbed wire fence attached to wooden posts. He was helped by Gerald Rose and Lyle Hankins. The

first sign that was put up read "No Trespassing," but another sign was put up later reading "property of Lawrence Harris and Gerald Rose." These signs were erected in the middle of the summer of 1947. More "no trespassing" signs were put up the same year. After the corn was picked in 1947, he hunted ducks, cleared more willows, and did some fishing until the ice froze. He further testified that the cottonwoods on the island were 4 or 5 inches in diameter, and some were smaller than that. After the cottonwoods were cleared, they were piled up and burned. In January, February, and March 1948, they banded some trees, cut some brush, and burned it. After the winter months they fenced some more of the island by continuing the fencing done in 1947 to the north on the island. This witness was unable to tell how many acres were cleared in 1949, but estimated 25 acres. He further testified that in 1949, mostly garden stuff was planted, and what corn was planted was picked by hand. In 1949, he was on the island off and on through the summer, about 2 or 3 days a week. In 1949 he had a brush rake, brush cutter, tractor, and a little planter to plant corn on the island. In 1950, during the months of January, February, and March, some brush was cleared and this witness did some trapping and hunting. In the same year he sowed some clover and redtop grass, and planted some pumpkins and squash. In 1950, he was on the island at different times. He knew of no one else being there except Gerald Rose. In 1949 and 1950 there were hunters and fishermen along the island, but he did not know who they were. He dug a well on the island in 1946, another one in 1947, and in 1950 he dug another well. The chute on the west side of the island was cut off in 1958. This witness testified that the chute was approximately 450 feet wide, more or less, before the Missouri River that flowed through the chute was shut off in 1958; and that the island was surrounded by water from the time he went on it in 1946 up to 1958.

According to this witness he and Gerald Rose cleared approximately 250 acres of land on this island, and they permitted others to hunt and fish on the island. He further testified that Omaha Creek is still running along the west side of the island, and is between 30 and 50 feet wide and about 4 feet deep; that he and Gerald Rose named the island in 1948; and that the fence that was put up in 1946 and 1947 had been torn down and washed out, and they repaired it at different times.

On cross-examination this witness testified that he could not say how many acres were cleared in 1950; and that in 1949, 20 acres or more were cleared, but he could not be exact because he had never measured it.

Allison Stewart testified that he lives on the island at this time. The first time he was on the island was in the spring of 1948. He was working for Gerald Rose for 3 or 4 days, and cut some brush. The next time he was on the island was in the winter of 1952, when he dragged some piling with Gerald Rose. Subsequent to 1952, he was on the island in 1953. He had seen "no trespassing" signs on the island. On cross-examination this witness testified that he left in the spring of 1948 and went to Chicago where he remained, off and on, for 5 years; that he took 2 months' vacation around 1952; and that Gerald Rose is his brother-in-law.

Roy Towl, chairman of the State Boundary Commission for Nebraska and an engineer, testified as an expert to the effect that the channel between the island and the mainland was never dry; that the boundary line between the State of Nebraska and the State of Iowa was approved in 1943; and that by an exhibit, Omi Island is partly in Nebraska and partly in Iowa.

Gerald Rose testified that he was familiar with the tract of land lying east of the Dartmouth College farm described as Omi Island; that the first time he was on the island was in the fall of 1945, where he went to hunt and fish; and that the next occasion was in 1946. At that time he erected a small building, cleared a few wil-

lows, and put in a little garden. This structure was built of boards and some poles set in the ground with a roof over it to keep them dry while they were clearing the land. He cleared some land where the structure was located, and some north, south, and west of that. He further testified that he had seen Harris on the island in April 1946; that he first planted field corn on the island in 1949; that he cleared the land of willows by using an axe and a corn knife, and continued clearing the land each year; that he and Harris put in garden, grass, and crops of corn; that he and Harris were asked by the Iowa Public Power Company for an easement across the island, which they granted; that when he first went onto the island in 1945 there was no cleared land on the island; that he and Harris built a 300-foot mat across the property in 1946; that the mat was woven for the purpose of getting from one part of the island to another; that he and Harris built a fence and put up "no trespassing" signs in 1946 and 1947; and that in 1947 they planted sweet corn and redtop grass and in 1949 they planted some field corn. He further testified that Harris and Lyle Hankins cleared the land which Duane Jenkins farmed for 1 year, which is north of the land involved in this litigation; that the house he constructed on the island in 1946 burned down and he erected another one in 1948; that he first had machinery on the island in 1947; and that he has had machinery there ever since.

On cross-examination a deposition of this witness was used wherein he testified that the shack burned down in 1946. At the time of trial he testified that the shack burned down in 1947. As to the land cleared in 1948, he testified at the trial that 15 acres were cleared. In his deposition he stated that 25 or 30 acres were cleared. About the brush cutter built and used, at the time of trial he testified that it was used in 1948, and in his deposition he stated it was used in 1953. At the time of trial he testified that he had chickens and hogs on

this island in 1959, and in his deposition he stated that he had chickens and hogs on the land in 1954 or 1955. He further testified that he saw Jenkins and Ropken in 1951 salvaging piling. He did not tell them they could not do it or ask them for any money received from this activity.

Wayne Ross testified that in the spring of 1950 he was on the island; that Rose made a deal to push a tractor across the chute, and Harris, Ivan Krumwiede, and Ralph Ropken were there; and that they had the tractor on a raft made out of piling and pushed it across with a boat.

Robert Fiscus testified that he was on the island in 1948 and saw Rose there. Rose was cutting some willows on the south tip of the island with a tractor. On cross-examination this witness testified that he saw other people on the island at least three times.

Wilfred Satterwhite testified that he knew the location of the island and had been around the island since he was a boy; that he has seen Rose and Harris on the island from time to time; and that he saw Harris on the island in 1945 or 1946, and Harris gave him some watermelons. In 1947 Harris had machinery on the island. There was a shack on the lower part of the island. He saw Harris and Rose cutting brush on the island in 1951. He further testified that he was on the island in 1953 when a conversation was had between Harris and the foreman of the Leon E. Williams ranch, the property now owned by the plaintiff, which conversation was to the effect that the foreman directed Harris to stay off the island, and Harris told the foreman to stay on his property and he, Harris, would stay on his own, indicating the island.

Doug Wilcox testified that he was acquainted with the island and was on it the first time in 1946, going there with Rose; that he was looking for piling; and that at that time he saw a small shack on the island that Rose told him he owned. He was on the island next in

1948 with Rose. He observed that Rose had been clearing some willows and small trees. He also saw a fence on the west side of the island. On cross-examination he testified that the shack was a makeshift affair made of willow poles and probably some canvas for a roof and walls, a sort of temporary shelter; and that he had been on the island fishing and hunting four or five times a year.

Jim Satterwhite testified that he had been around the island ever since it existed; that he had a fishing camp by the island in 1946; that since 1946 he has seen Harris and Rose going back and forth to the island; and that there was always flowing water around the island, except for the time when ice was on the river.

George Berger testified that he was on the island in 1946 and that was the first time he saw Harris there. He did not recall the first time he saw Rose on the island. There was a small amount of clearing and a small shack on the island at that time. He saw vegetables and corn planted on the island in 1948. On cross-examination he testified that he saw a crop of corn planted by Duane Jenkins.

Mark M. Cain testified that he was acquainted with the island; that in 1946 he and Harris built a shelter; that in 1947 he was on the island for the reason that he was a commercial fisherman and had to put the river boats where they could be sheltered; and that he believed he saw some machinery on the island in 1948.

Lyle Hankins testified that he was acquainted with the island and was first on it with Harris in 1946; that they put up a shack, hunted and fished, did some clearing of brush, and put in a garden; that he was on the island in 1947 with Harris, and Rose was also on the island; that they cleared some brush, fished and hunted, and planted garden; that he was on the island in 1948 and at that time Harris made a homemade tractor; that Duane Jenkins farmed some land on the island in 1951, and this witness worked for Jenkins for 2 days;

and that he and Harris had cleared the land Jenkins farmed prior to the time Jenkins farmed it. On cross-examination this witness testified that he did not know how many acres were cleared, but that there were about 5 patches of garden in 1949.

Merrill Boyd testified that he first saw Harris on the island in 1946 or 1947; that he saw a shack on the island in 1948; that in 1948 he saw a fence and "no trespassing" signs along the west side of the island erected by Harris and Rose; and that he also saw a garden on the island in 1948. He further testified that he saw Harris clearing willows in 1947 and 1948; that he asked Harris for permission to erect a duckblind off the island in 1946; that it first became impossible to get around the island by boat in 1958; and that there was running water there all the time except when it would freeze.

Flay Boyd testified that he was on the island in 1947, and at that time Harris was occupying the island.

The record also shows tax list corrections of Dakota County for the year 1954. The reason for the correction was "pt of island of accretion." There is evidence indicating that the defendants requested this property be placed on the tax rolls in 1957.

In rebuttal the plaintiff adduced evidence in substance as follows.

John Laros testified that he had examined all of the aerial photographs offered by the plaintiff; that he could see no evidence of farming on the island in 1949; and that the photograph for 1955 was the first evidence he could detect of cultivation on the island.

Ivan Krumwiede testified that he had lived in Dakota County all of his life, was familiar with Omi Island, and had lived in that vicinity for a period of 40 years; that he knew Harris and Gerald Rose, and was a brother-in-law of Harris; that he was acquainted with the island prior to 1946, and was on it 8 or 10 times and did not see Harris or Rose on the island; that he was generally on the island 2 or 3 times a year from 1946 to 1950 to

hunt and fish; that he saw no dwelling, fences, or cultivation on the island; that the first time he saw any farming on the island was in 1951, and this farming was done by Ropken and Jenkins; that when Harris was on the island from 1946 to 1950, he was just fishing and gathering up oil barrels and lumber from the river; that Harris planted some melons on the island in 1953; and that he was acquainted with the farming operations of Ralph Ropken and knew that he was on the island between 1950 and 1954. He further testified that he conducted piling salvage operations on the island in the fall and winter of 1949.

Tag Krumwiede testified that he was familiar with the island; that he was on the island occasionally from 1946 to 1949, and found no evidence of habitation, farming, or fencing; that he was on the island in January 1950 on two occasions, for the purpose of searching for piling; that in January 1950, the island was covered with willows and brush; that he did not see any "no trespassing" signs on the island; and that from 15 to 25 hunters, and maybe more, asked permission from him to hunt on the island because that is a favorite hunting place.

Dewey Krumwiede testified that he was on the island occasionally between 1946 and 1950, and saw no evidence of habitation or cultivation.

Ralph Ropken testified that he was familiar with the island and became acquainted with it first in 1949 when he helped Ivan Krumwiede drag piling off of the the island; that in the winter of 1950 he and Duane Jenkins gathered piling on the island; that he was all over the island by tractor and on foot, and saw practically all of the island, but saw no signs of human habitation or cultivation, nor did he see any fence, farm machinery, or trespassing signs on the island; that he and Duane Jenkins started farming on the island in 1951, in the same area where it was later cultivated by Rose and Harris; and that he returned to the island in

1953. At that time Harris had a little patch of melons on the island, and a winch with which he was dragging piling. Harris came onto the island to garden in 1953, and Rose came on the island to garden or cultivate it in 1955.

Byron B. Morrow, also known as Bud Morrow, testified that in the winter of 1950 and the early part of 1951, he was raking piling off the river and gathering piling that was available on the bars and banks of the Missouri River; that he went on the island in October 1950, and was there until some time in February 1951; that he had a team of horses, and salvaged considerable piling from the island; and that he was pretty well all over the island and found no evidence of settlement, cultivation, or habitation. There are two exhibits in evidence which corroborate this witness' actions in gathering piling and fixing the time.

We have examined the maps, the aerial photographs, and all of the exhibits received in evidence. The maps and aerial photographs disclose a comprehensive history of the land here involved.

It was stipulated that the first half of the 1954 taxes were paid by Leon E. Williams in 1958. The remainder of this tax was unpaid.

It will be noted from the evidence adduced by the parties that there is a direct conflict on the main issues here involved. This being true, the rule is: "Actions in equity, on appeal to this court, are triable de novo, subject, however, to the rule that when evidence on material questions of fact is in irreconcilable conflict, this court will, in determining the weight of the evidence, consider the fact that the trial court observed the witnesses and their manner of testifying, and must have adopted one version of the facts rather than the opposite." Dunbier v. Rafert, 170 Neb. 570, 103 N. W. 2d 814.

"A party, in order to establish title to real property by the operation of the statute of limitations, or in other words by adverse possession, must prove by a pre-

ponderance of the evidence that he has been in actual, continuous, notorious, and adverse possession of the property under claim of ownership during the full period required by the statute. * * * The statutory period for the establishment of title to real estate by adverse possession is 10 years." Jones v. Schmidt, 170 Neb. 351, 102 N. W. 2d 640.

"To determine the acts necessary to constitute adverse possession it is sometimes necessary to take into consideration the character of the property and the purposes for which it is suitable." Walker v. Bell, 154 Neb. 221, 47 N. W. 2d 504.

"It is the visible and hostile possession, with an intention to possess land occupied under a belief that it belongs to the possessor, that constitutes its adverse character. Ordinarily the hidden or remote view or belief of the possessor in taking possession does not relate itself to the adverse character of the possession." Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331.

In Frank v. Smith, 138 Neb. 382, 293 N. W. 329, 134 A. L. R. 458, this court held: "Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shore line out by deposits made by contiguous water, or by reliction, the gradual withdrawal of the water from the land by the lowering of its surface level from any cause."

In the instant case the parties do not question that accretion is here involved.

It appears from the record that the defendants claim ownership of the entire island. The evidence shows that the land in question was used by the public generally for the purpose of hunting, fishing, trapping, pulling piling, and picking up flotsam. The defendants were engaged in these activities, and such are insufficient to place the owner on notice of adverse possession.

The evidence shows that in the early part of 1951, the defendants well knew that others were using and occupying the island. In this connection we make refer-

ence to the evidence of Duane Jenkins, Byron B. Morrow, and Ivan Krumwiede. The defendants made no objection to such occupancy, nor did they seek to oust the parties from the land. In 1951, Duane Jenkins put in about 40 acres of crops on this land. Ralph Ropken testified that he and Duane Jenkins had the island to themselves when they were working on it. Harris came on the island and started to do some work on it in 1953, and Rose came on the island for the same purpose in 1955. Ivan Krumwiede testified that Harris first cultivated some of the land on the island in 1953, with his permission.

"In determining whether particular acts of ownership indicate an adverse possession, the usual and ordinary use of similar lands by their owners should be taken into consideration. No precise rule of general application can be laid down. Any act, or series of acts, which shows the open, notorious, exclusive, and hostile possession of one who claims to be the owner of the land may be proven as evidence of adverse possession. Thus, such possession may be evidenced by * * * clearing and cultivating, * * * pasturing, cutting timber, * * * fishing, * * * or performing similar acts. However, irrespective of the character of ownership asserted, acts of dominion over the land must, to be effective as against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. A mere temporary use of the property by a trespasser at intervals, whether such intervals are remote or frequent, is not enough." 1 Am. Jur., Adverse Possession, § 132, p. 867. See, also, Huston v. Graves (Mo.), 213 S. W. 77, 5 A. L. R. 423; Walker v. Bell, *supra;* Stokes v. State, 121 Ark. 95, 180 S. W. 492, Ann. Cas. 1917D 657.

The record also shows that this land is a part of a large alluvial plain in which the river has moved back and forth to a considerable extent during the years.

The accretion border to which the land accreted · is shown by a decree of the district court for Dakota County in 1933, which determined that the plaintiff's predecessors in interest held and owned land lying to the east of Omaha Creek which for some years prior had been established in its present course running southward along a high water chute.

In Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647, this court said: "The evidence clearly sustains the claim that the formation of the accretion land had gone on to a considerable extent before this little creek cut down across it. In our opinion this does not render void the plaintiff's just claim to this land so formed. We are supported in this holding by several cases, among them Dowdle v. Wheeler, 89 S. W. 1002 (76 Ark. 529), which holds: 'Where an accretion has begun by a deposit against the shores of the mainland, the subsequent existence of an intermediate stream between the mainland and the accretion does not prevent the accretion from belonging to the owner of the mainland.'" Title was confirmed in the plaintiff and the defendants were enjoined from claiming title to, or possession of, any of said land.

The maps, plats, abstracts, and also the 1933 and 1938 quiet title judgments established the north and south lines of the property here involved, as extensions of the United States government survey lines to the riparian border. In other words, the north line was the centerline of Section 15 extended east to the river, and the south line was the south line of Section 22 extended east to the river.

Lawrence H. Hart, one of the United States government engineers who had worked on the river for more than 28 years, called the channel down to Omaha Creek a "high water chute." This does not imply an island, but simply a watercourse that will have higher water at some times than at others, and will be dry in spots or in part at low water.

As to the ownership of this property, see Independent Stock Farm v. Stevens, *supra*, where the court said that plaintiff's predecessor in title owned the land extending east of Omaha Creek. The accretion in question is that very land which became a part of plaintiff's land.

Other assignments of error made by the defendants are without merit.

For the reasons given in this opinion we affirm the judgment of the trial court.

AFFIRMED.