IVAN KRUMWIEDE ET AL., APPELLEES, v. GERALD ROSE ET AL., APPELLANTS.

129 N. W. 2d 491

Filed July 10, 1964. No. 35677.

Mark J. Ryan, Cecil W. Orton, and Kindig, Beebe, McCluhan & Rawlings, for appellants.

Smith & Smith, for appellees.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

WHITE, C. J.

This is a controversy about some, accretion land in the Missouri River bottom between the eastern and western "high banks." The plaintiffs are the western high-bank owners. The land is embraced within the extension of the existing government survey lines of the plaintiffs' property to the thread of the main stream of the river flowing next to the eastern Iowa high bank. The defendants claim the land in question by virtue of

adverse possession. For clarity purposes only, this opinion will refer to the land in controversy as being the northern part of "Omi Island." Plaintiffs bring an action to quiet title, as riparian owners, basing their petition on the theory that they are the riparian owners of this land that has developed as accretion to their property on the bank of the river. Defendants claim that the land is an island to which they have independently acquired title by adverse possession and counterclaim for a decree quieting title to them to that effect. The southern half of Omi Island was the subject of litigation with these same defendants, Harris and Rose, with the identical issues involved, in Dartmouth College v. Rose, 172 Neb. 764, 112 N. W. 2d 256 (December 1961). The main difference between that litigation and the present litigation is that this case refers to the north half of the island and the plaintiff riparian owners in this case are different than in the Dartmouth College case. Reference is made to that case in order to secure a consecutive and comprehensive picture of the litigation involving this island. Most of the same witnesses, both lay and expert, testified in the Dartmouth College case, and their testimony in that case and in this case is strikingly similar, if not identical. Many of the same aerial photographs, maps, and exhibits used in that case were used in this case. The decision in the Dartmouth College case is not res judicata of the issues in this case because the parties plaintiff are different here. As will be seen, however, the decision in that case on the same issues is, on reexamination, controlling in this case as a matter of precedent when applied to the northern half of the same tract of land or island. Plaintiff riparian owners prevailed in the Dartmouth College case and also in this case in the district court's decision. A judgment was entered quieting title in the plaintiff high-bank riparian owners to the land in question. The decision of the district court was based largely on the

holding in the Dartmouth College case. We affirm the trial court's holding.

This land developed in the lower or channel bottom of the Missouri River during a period of some 30 or 35 years in the past. The first question we will discuss is the nature of this land and its development as it relates to the basic theory of plaintiffs' claim to title in the island. Generally, the evidence shows that between the two high banks on the Nebraska and Iowa sides, the main channel of the Missouri River has moved back and forth to a considerable extent during the years. The present main stream against the Iowa eastern high bank, and the eastern portion of the plaintiffs' land that undisputedly belongs to them and the disputed land, Omi Island, are a part of a large, wide, low, alluvial plain within which the changing movement of the main channel has taken place since historic times. Channel change, accretion, and reliction, and island formation are constant and continuing processes on this alluvial Missouri River plain. All expert testimony together with numerous aerial photographs taken of the river since 1930 establish an understandable picture of how the land referred to herein as Omi Island was created. At the risk of over-simplification in a technical sense, it is clear that all of the land in controversy has been created and developed by the process of accretion and reliction. In Burket v. Krimlofski, 167 Neb. 45, 91 N. W. 2d 57, this court stated the applicable definitions to these terms when applied to a substantially similar situation on island formation and riparian bank accretion on the Missouri River. The court stated: "The rules also are: Land uncovered by a gradual subsidence of water is not an accretion, but a reliction. The same law applies to both these forms of addition to real estate which are held to be the property of the abutting landowner. State v. Ecklund, 147 Neb. 508, 23 N. W. 2d 782. Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shore

line out by deposits made by contiguous water, or by reliction, the gradual withdrawal of the water from the land by the lowering of its surface level from any cause. Where by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner. Ziemba v. Zeller, 165 Neb. 419, 86 N. W. 2d 190. Accordingly we will refer to the land herein involved as accretion land without making an effort to determine where accretion ends and reliction begins."

The expert testimony and the aerial photographs, beginning in 1930, lead to a conclusion that the main, direct, and deeper channel of the Missouri River has generally been on the east and close to the Iowa high bank. But, there has been, until about 1945 or 1946, a channel or chute on the western side also. There is some variation as to the description and difference of opinion as to the function of this chute or channel on the west. The 1930 aerial photograph shows the beginning of the formation of the sandbar or island which extends slightly into the area now claimed by the plaintiffs. At that time, this sandbar or island was out in, if not close to, the center of the one main stream channel of the Missouri River. The evidence shows that it gradually became larger by the process of accretion. By 1939 or 1940 it had grown large enough so that it can be stated that the channel split just above Omi Island. The deep channel flowed to the east or to the left. There was a wide channel or high water chute on the west side of Omi Island. The aerial photographs show, and especially around 1939 or 1940, that water in the west channel or high water chute extended close to the high bank of the plaintiffs' property on the west. This western channel or high water chute submerged, in varying degrees and at different times, land between plaintiffs' west high bank and Omi Island. The preponderance of the evidence and the testimony of Hart

and Towl, the two expert engineers, establish that since 1930 the western channel was a high water chute. The deep channel flowed to the east. The expert oral testimony and the photographs paint quite a clear picture of the successive processes in building up Omi Island and the whole land in controversy that is now joined in one tract from the west. Floods, wind, and deposits from Omaha Creek which came from the north on the mainland and emptied into the western chute in this area, caused a gradual process of accretion. It is fair to state that the island filled in to the west, and the main bank to the east, from the processes of accretion in the chute. It is also fair to state that deposits from the eastern and deeper side of the channel, the Iowa side, also aided this process. By 1938 or 1939 the island had grown in size so that it reached north beyond the northernmost point of the plaintiffs' riparian boundary lines extended and had built to the west considerably. About 1938 or 1939 this land or island, lying between the eastern main channel and the western chute, was large enough to be the occasion of a major channel operation by United States Army Engineers. On the eastern side of Omi Island they dug a pilot channel. Above the pilot channel they staked out the Missouri River in order to direct the flow into the pilot channel. The objective of this work was to create a new main unitary channel through the island. The photographs and the evidence show that until 1942 they partially succeeded in establishing a new central channel through the center of the island. Water was beginning to flow from both the chute and the eastern main channel into the pilot channel. This work broke down about 1942 during the war. Between 1942 and 1945, as a result of the breakdown of these structures, the main channel returned rather quickly to the eastern or Iowa side altogether. The western channel or high water chute started plugging up, adding sand, soil, and increasing amounts of vegetation in its bottom. At the same time,

the southern or bottom portion of this high water chute started filling up. Eventually, about 1958, the United States Army Engineers plugged the western high water chute and as a result there is very little, if any, water flowing in the bed of the channel of the western chute. By 1945 or 1946 all of the eastern part of Omi Island was quite densely covered with soil, willows, and vegetation. The sandy stretch to the west comprising the bed of the western high water chute, and the adjacent land forming out from the plaintiffs' western high bank, were becoming covered with vegetation and were becoming increasingly usable. For practical purposes beginning about this time there was continuous access to all of the land stretching from the western high bank. The intervening water of Omaha Creek and of the chute was easily crossed. About 1946 people began using this land for recreational purposes and for digging piling out of the abandoned river channel work. There is no evidence in this case, and it is difficult to see how there could be, to the effect that these processes were any other or different as to the southern part of the island involved in the Dartmouth College case, than as to the northern part of the island involved in this case. Against these some defendants, we decided this issue in the Dartmouth College case as follows: "The record also shows that this land is a part of a large alluvial plain in which the river has moved back and forth to a considerable extent during the years. The accretion border to which the land accreted is shown by a decree of the district court for Dakota County in 1933, * * *. *The accretion in question is that very land which became a part of plaintiffs' land.*" (Emphasis supplied.)

Returning now to the contention of the parties, they both agree that it is accretion land, but accretion to what? Defendants' theory is that the land in question, known as Omi Island, was formed from an original island in the channel of this stream and that accretion and reliction thereto has produced all of the land in

dispute. Plaintiffs' theory is that they are riparian owners of accretion land that has gradually been formed and added to their western high bank land through the years. On review of the evidence in this case, we adhere to the holding in the Dartmouth College case. The reasoning of that holding is controlling here even though the doctrine of res judicata is not applicable to this case.

Defendants rely upon the testimony of Missouri River engineer, Roy N. Towl, and strenuously urge that the difference in his testimony from the other case furnishes ample grounds for departure from the holding in the Dartmouth College case as to the southern half of this land. It is true that this witness' testimony, based upon long experience in dealing with the Missouri River valley and this particular area, may be interpreted to the effect that a large part of the land in question comes from accretion to independently formed Omi Island, which started as a sandbar arising from the bottom of the old main channel of the Missouri River. One portion of his testimony gives rise to an inference that the land in question is not accretioned to the mainland at all. At this point, however, there is a complete gap in the defendants' argument. They simply assert that the plaintiffs cannot recover in a quiet title action because they must show that this land was accretion to the western high bank. Since it is not, they say, the plaintiffs may not prevail because they must recover on the strength of their own title. This contention is in error.

It makes no difference whether the land began as a sandbar island in a main stream or whether it was all formed by accretion to the mainland or by both processes joining. If, as in Burket v. Krimlofski, *supra,* there is another owner of the island, then the ownership is split to the thread of the chute in which the accretion is taking place to both the island and the mainland. Who owned Omi Island at the time of its origin? In Nebraska the rule as to ownership on the bottom of the river including islands formed by accretion to the thread of

the channel is the same, whether the stream is navigable or nonnavigable. The only difference is that in case of a navigable stream, such as the Missouri River, it is subject to the superior easement of navigation. This basic decision was reached in Kinkead v. Turgeon, on rehearing, 74 Neb. 580, 109 N. W. 744, 7 L. R. A. N. S. 316, 13 Ann. Cas. 43, 121 Am. S. R. 740. The exact application to the case at bar is the holding in Independent Stock Farm v. Stevens, 128 Neb. 619, 259 N. W. 647, where it is said: "All states do not agree as to the ownership of land along navigable streams like the Missouri river. In Nebraska this court, after the rehearing in the case of Kinkead v. Turgeon, 74 Neb. 580, 7 L. R. A. N. S. 316, 13 Ann. Cas. 43, *held that riparian owners are entitled to the possession and ownership of the soil formerly under the waters of such a stream as far as the thread of the stream, while in other states the title to the bed of the navigable river is in the state, and the grantee of land along the line of such stream owns only to the shore line.* Haight v. City of Keokuk (1856) 4 Ia. 199; Payne v. Hall, 192 Ia. 780. So that if an island occurs in the Missouri river on the Iowa side of the thread of the stream, *it is an accretion to the soil in the bed of the river, and not to the land of the riparian owner.*" (Emphasis supplied.)

An owner of land on shore, in the absence of restrictions on his grant, owns to the thread of the stream, and his riparian rights extend to existing and subsequently formed islands. Ohm v. Clear Creek Drainage Dist., 153 Neb. 428, 45 N. W. 2d 117; Haney v. Hewitt, 105 Neb. 746, 181 N. W. 861; Higgins v. Adelson, 131 Neb. 820, 270 N. W. 502; Briard v. Hashberger, 107 Neb. 199, 185 N. W. 430; Burket v. Krimlofski, *supra.*

The evidence shows that a signifcant factor in the development of Omi Island and this land was the construction and channel work of the United States Army Engineers attempting to control the channel of the river, divert it, and develop a new channel across Omi

Island beginning about 1938. As we have mentioned, this development work finally resulted in the destruction of the western channel or high water chute and the acceleration of accretion to both the west bank and the original Omi Island. The fact that third parties performed construction work and accelerated these processes does not alter the application of the rule as to ownership of accretion land. Ziemba v. Zeller, 165 Neb. 419, 86 N. W. 2d 190; Burket v. Krimlofski, *supra.* Nor does the intervening flow of Omaha Creek affect this determination. Dartmouth College v. Rose, *supra;* Independent Stock Farm v. Stevens, *supra.*

Omi Island, if such, and all accretions to it and to the mainland became the property of the riparian owners at the time of the accretion. The evidence here, including the abstract of title, establishes ownership in the plaintiffs as successors to the original owners of the riparian land at the time of the development and appearance of Omi Island. This, of course, occurred many years prior to the defendants' first appearance or claim of title to the land beginning about 1946, the land becoming accessible and usable at about that time.

Nevertheless, the defendants claim title by adverse possession beginning in 1946. To the defendants' evidence in this respect we apply the same test that was used in Dartmouth College v. Rose, *supra,* against the same defendants as to the adjoining land of Omi Island to the south. We said: "In the instant case the parties do not question that accretion is here involved. * * * It appears from the record that the *defendants claim ownership of the entire island.* The evidence shows that the land in question was used *by the public generally for the purpose of hunting, fishing, trapping, pulling piling;* and picking up flotsam. *The defendants were engaged in these activities, and such are insufficient to place the owner on notice of adverse possession.* * * * The evidence shows that in the early part of 1951, the defendants well knew that others were using and oc-

cupying the island. In this connection we make reference to the evidence of Duane Jenkins, Byron B. Morrow, and Ivan Krumwiede. The defendants made no objection to such occupancy, nor did they seek to oust the parties from the land. In 1951, Duane Jenkins put in about 40 acres of crops on this land. Ralph Ropken testified that he and Duane Jenkins had the island to themselves when they were working on it. Harris came on the island and started to do some work on it in 1953, and Rose came on the island for the same purpose in 1955. Ivan Krumwiede (a plaintiff in the present case) testified that Harris first cultivated some of the land on the island in 1953, with his permission. * * * 'In determining whether particular acts of ownership indicate an adverse possession, the usual and ordinary use of similar lands by their owners should be taken into consideration. No precise rule of general application can be laid down. Any act, or series of acts, which shows the open, notorious, exclusive, and hostile possession of one who claims to be the owner of the land may be proven as evidence of adverse possession. Thus, such possession may be evidenced by * *, * clearing and cultivating, * * * pasturing, cutting timber, * * * fishing, * * * or performing similar acts. However, irrespective of the character of ownership asserted, acts of dominion over the land must, *to be effective as against the true owner,* be so open, notorious, and hostile as to put an ordinarily prudent person *on notice of the fact that his lands are in the adverse possession of another.* A mere temporary use of the property by a trespasser at intervals, whether such intervals are remote or frequent, is not enough.' 1 Am. Jur., Adverse Possession, § 132, p. 867. See, also, Huston v. Graves (Mo.), 213 S. W. 77, 5 A. L. R. 423; Walker v. Bell, supra; Stokes v. State, 121 Ark. 95, 180 S. W. 492, Ann. Cas. 1917D 657." (Emphasis supplied.)

We will not recite the detailed testimony of the witnesses as to adverse possession. The same defendants

and most of the same witnesses testified as in Dartmouth College v. Rose, *supra*. A detailed recital of these witnesses' testimony will be found in that case. The additional testimony offered here is cumulative in nature. All of this testimony is not only substantially similar, but almost identical to the testimony given by these same witnesses in the present case. We attach to it the same significance we gave to it in the Dartmouth College case. The evidence is sufficient to establish that whatever possession the defendants made of the land was not a visible and hostile possession with an intention to possess the land occupied under a belief that it belonged to them. Ordinarily the hidden or remote view or the belief of a possessor in taking possession does not relate itself to the adverse character of the possession. Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331. The evidence fails to meet the primary test of adverse possession that the defendants have been in actual, continuous, notorious, and adverse possession of the property under claimed ownership during the period of 10 years required by the statute. See Jones v. Schmidt, 170 Neb. 351, 102 N. W. 2d 640. This land was used for recreational purposes by the public generally subsequent to 1946. It was also used by many parties for the purposes of pulling up the abandoned piling on the shore, for fishing, and for picking up flotsam. The defendants were doing these same things along with and during the period of time that many other people were. They claim to have built several structures on the property and to have cleared and raised crops several years. Much of this testimony was denied by many other witnesses who were on the island during the period of time that the defendants claim that these acts took place. The defendants claim that they erected shacks, fences, and "no trespassing" signs on the property. Witnesses who were on Omi Island many times deny seeing these evidences of their possession. It appears that at no time did the defendants oust either the plaintiffs or any

other of the numerous parties who were on the property and who were performing the same acts that the defendants claim they did. In one sense, every one of the parties who were on this property for recreational purposes occupied it hostilely for the short periods of time that they were on it. The defendants' testimony fails when it comes to proving the elements of exclusiveness and continuousness. Without dispute, other parties grew substantial acreages of crops on the land in the years between 1951 and 1955. In subsequent years, other parties also grew crops and performed many of the same acts of possession claimed to have been performed by the defendants. Some of the parties who had grown crops on the island testified that they had the island to themselves while they were working it. As an original matter, the evidence fails to measure up to the tests that are required to establish title by adverse possession. In any event, giving maximum reach to the defendants' testimony, it establishes, at most, a direct conflict in the testimony. The trial judge saw and observed the witnesses and resolved this conflict in favor of the plaintiffs who were the riparian bank owners. These findings should be given great weight, as they were in Dartmouth College v. Rose, *supra.* See, also, Dunbier v. Rafert, 170 Neb. 570, 103 N. W. 2d 814.

No problem appears in this case as to the description of the property, or its proper apportionment. The court by its judgment extended the existing government survey lines of the plaintiffs' property to the thread of the river. This is the correct apportionment rule and it was applied here and in the prior adjudication concerning this property. See 65 A. L. R. 2d, § 6(a), p. 159, § 6(b), p. 162.

The judgment of the trial court was in all respects correct and is affirmed.

AFFIRMED.