LOUIS ZIEMBA, APPELLEE, V. LEONA T. ZELLER ET AL.,
APPELLANTS.
86 N. W. 2d 190

Filed November 15, 1957.   No. 34202.

*Brower & Brower* and *John F. McCarthy*, for appellants.

*Raecke & Phares* and *Boyle & Hetzner*, for appellee.

Heard before CARTER, MESSMORE, YEAGER, CHAPPELL, WENKE, and BOSLAUGH, JJ.

CHAPPELL, J.

Plaintiff, Louis Ziemba, brought this action in ejectment, claiming to be the owner and entitled to possession of a portion of the northeast quarter of Section 1, Township 16 North, Range 5 West of the 6th P. M., and part of the southeast quarter of Section 36, Township 17 North, Range 5 West of the 6th P. M., in Nance County. All of such land was originally on the south side of the Loup River but now is on the north side thereof. Defendants Leona T. Zeller and Robert C. Purvis, owners of land adjacent thereto, and defendant Mike Prososki, who was their tenant, admitted that they were in possession of plaintiff's lands aforesaid, but claimed ownership and right to possession thereof by accretion and adverse possession.

Upon trial of the issues to a jury, it returned a verdict for plaintiff, finding that he was the owner and entitled to possession of the property as claimed by him. Judgment was accordingly rendered thereon, and defendants' motion for new trial was overruled. Therefrom defendants appealed, assigning error as follows: (1) The admission of exhibit No. 12 over objection of defendants; (2) the verdict was not sustained by the

evidence but was contrary to law; and (3) the giving of and refusing to give certain instructions. We conclude that the assignments should not be sustained.

The first assignment has no merit. Exhibit No. 12 was a photostatic copy of a map or plat of the lands involved, which was prepared in 1937 by a county surveyor from a survey just previously made by him. Such plat was duly recorded in Nance County on April 8, 1937. Without citing any authority, defendants argued that: "There is a great deal that is unsatisfactory in the foundation to Exhibit 12 * * *." An examination of the record discloses that ample foundation was laid for its admission. Also, as a matter fact, defendants argued in their own brief that the exhibit was beneficial to them in certain respects upon the issues of accretion and avulsion.

We reaffirmed in Jacobsen v. Poland, 163 Neb. 590, 80 N. W. 2d 891, that: "It is for the jury to determine controverted issues of fact in a law action if the evidence is in dispute."

In that connection, in Jensen v. Priebe, 163 Neb. 481, 80 N. W. 2d 127, we reaffirmed that: "In testing the sufficiency of the evidence to support a verdict it must be considered in the light most favorable to the successful party, that is, every controverted fact must be resolved in his favor and he should have the benefit of every inference that can reasonably be deduced therefrom."

In Reams v. Sinclair, 97 Neb. 542, 150 N. W. 826, this court held that: "In an action of ejectment, the plaintiff must allege and prove a legal title and right of possession."

In Frank v. Smith, 138 Neb. 382, 293 N. W. 329, 134 A. L. R. 458, this court held: "Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shore line out by deposits made by contiguous water, or by reliction, the gradual withdrawal of the water from the land by the

lowering of its surface level from any cause.

"Where, by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner.

"The fact that accretion is due, in whole or in part, to obstructions placed in the river by third parties does not prevent the riparian owner from acquiring title thereto.

"Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel. Commissioners v. United States, 270 Fed. 110." See, also, State v. Ecklund, 147 Neb. 508, 23 N. W. 2d 782.

In Bouvier v. Stricklett, 40 Neb. 792, 59 N. W. 550, this court held: "Where a stream of water is the boundary line of a tract of land, and it suddenly abandons its channel, and makes for itself a new course or bed, by cutting across a neck or bend, as it did in the case at bar, the middle of the old channel or bed of the stream still constitutes the boundary line of the tract of land, though it may be dry, or no water flowing therein."

In Iowa Railroad Land Co. v. Coulthard, 96 Neb. 607, 148 N. W. 328, it was held: "Where a stream which is a boundary from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary; the boundary remains as it was in the center of the old channel, although no water may be flowing therein. State of Nebraska v. State of Iowa, 143 U. S. 359.

"If the change in the stream is violent and visible, and arises from a known cause, such as a freshet, or a cut through which a new channel has formed, the original thread of the stream continues to mark the limits of the two estates. Gould, Waters (3d ed.) sec. 159."

This court recently reaffirmed that: "The title to

land becomes complete in the occupant by adverse possession when he and his grantors have maintained an actual, exclusive, open, and continuous possession thereof, claiming title to the same against all persons, for 10 years." James v. McNair, 164 Neb. 1, 81 N. W. 2d 813. See, also, Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331, wherein we held: "The claim of title to land by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for the statutory period of 10 years."

Also, as stated in Wells v. Tietge, 143 Neb. 230, 9 N. W. 2d 180: "The payment of taxes is an element and circumstance which may be considered together with all of the other circumstances of the case with respect to the subject of adverse possession."

In the light of the foregoing rules, we have examined the record. It discloses that at the time of the government survey in 1876, all of the land involved was on the south side of the Loup River but now is all on the north side thereof. Plaintiff obtained the legal title to Lots 1 and 2 and the south half of the northeast quarter of Section 1 by warranty deed from Peter Uzendoski and Kate Uzendoski on April 24, 1933. About 45.81 acres of such land still remain south of the Loup River, but about 40.74 acres thereof are now north thereof. Plaintiff obtained title to a 16.18-acre adjacent tract in Lot 1 in the southeast quarter of Section 36 by warranty deed from Earl D. Willard et al., on May 28, 1954, all of which is now north of the Loup River. Those lands now north of the river are involved here. The record titles aforesaid were traced by the abstracts from the United States to plaintiff. Originally, the only land on the north side of the river in the adjacent southeast quarter of Section 36 was Lots 2 and 3. The record title thereto was traced by the abstracts from the United States to defendants Leona T. Zeller and Robert C. Purvis, except a small portion not here involved, which

had been deeded to the Loup River Public Power District.

In that situation, plaintiff claimed to be the owner and entitled to possession of the lands deeded to him as aforesaid, which are now on the north side of the river, and defendants admitted that they are in possession thereof, but claimed to be the owners with a right to possession thereof by accretion and adverse possession.

We turn first to the issue of accretion. In that connection, plaintiff contended that the location of such lands was changed from the south to the north side of the river by avulsion and not by accretion as claimed by defendants. The jury so found, and we conclude that although in dispute, as admitted by defendants in their brief, the evidence amply supported that conclusion. There is competent evidence as shown by the survey and plat or map made in 1937, aerial photographs taken on July 22, 1938, and again on October 9, 1950, and the testimony of eyewitnesses, that the river prior to 1936 flowed in its channel north, thence east to the west end of Section 1, thence northeast across plaintiff's land, thence east and directly south for some distance, thereby forming a loop. In 1936, just east of that point, the Loup River Public Power District constructed a diversion dam and a riprapped dike some 700 to 800 feet long, which ran from the headgate northwest to the river loop, thence west across it, which shut off the main channel. Then, in order to divert the flow to the headgate, pilings were driven along the dike and a new channel was cut through with a bulldozer. At that time, the channel of the river was abruptly changed and it came from the west almost straight through toward the east to the dam, thence south, and cut off plaintiff's land here involved, leaving it on the north side of the river channel. Thereafter the old channel gradually filled up with debris, brush, and sizeable trees, generally like the land adjacent thereto.

Also, the tax records from 1930 to 1956 relate them-

selves to both adverse possession and avulsion. In 1930 that record shows 150 acres in the northeast quarter of Section 1 assessed to and taxes paid by plaintiff's predecessors in title. In 1931 and 1932, the same land was so assessed with taxes paid by plaintiff. From 1933 to 1937, inclusive, the same land was assessed in plaintiff's name, and the taxes were paid by him. In 1938, the first year after the survey heretofore noted was made and the plat was filed of record, and the second year after the dam and dike were completed, there was a change in plaintiff's assessment which resulted in his assessment upon only 86.55 acres, consisting of two tracts in the northeast quarter of Section 1. One such assessment was upon 40.74 acres and the other was upon 45.81 acres. The same acreage was also assessed in each year from 1939 to 1956, all of which taxes plaintiff has paid except for 1956. In that connection, the 1937 survey and plat show plaintiff's acreage in the northeast quarter to be 45.82 acres south of the river and 40.74 acres north of the river. The tax record also shows that after plaintiff obtained his warranty deed to the 16.18 acres in Lot 1 of Section 36, he paid the taxes thereon in 1955. Such record corroborates the testimony of plaintiff and other witnesses, one of whom was called by defendants, that an avulsion had taken place about the time the Loup River Public Power District constructed its diversion dam and dike. Also, the payment of taxes by plaintiff on 40.74 acres north of the river from 1938 to 1956 supports plaintiff's contention that there had been an avulsion and he still owned that land. This is particularly true since there is no evidence that defendants ever paid any taxes on any of said lands here involved or placed anything of record indicating claim of ownership thereof.

With regard to the 16.18 acres in Lot 1 of the southeast quarter of Section 36, for which plaintiff received a warranty deed on May 28, 1954, the tax records show the following: It was listed as 16.16 acres in the river

for 1930 to 1937 inclusive. In 1938 and 1939 it was valued at $560, with tax sales against it which were subsequently cancelled. In 1940, 1941, and 1953, it was given no valuation. In 1942 to 1952, inclusive, and again in 1954, it was listed as in the river. In 1955 no valuation thereof was listed, but the consolidated state and county tax was $12.44, which plaintiff paid on April 3, 1956. In 1956 the valuation was shown as $90, with a tax of $1.65, which was unpaid at time of trial. It was certainly reasonable for the jury to conclude from the foregoing evidence that defendants could not have obtained ownership of such land either by accretion or adverse possession while it was in the river.

Nevertheless, the evidence upon the issue of adverse possession was conflicting in material respects and a question for the jury. In that connection, contrary to their claim of ownership by accretion, defendants adduced evidence that the channel of the river had never changed in any material respect and that they and their predecessors had used all of the land involved south of the dike to the river for pasturage of their cattle prior to and since 1936. However, we find no direct evidence that they did so claiming to own the land adversely to the owners thereof. In that connection, it is significant that while defendants claimed to have so pastured their cattle, there is no evidence whatever that they ever at any time constructed any fences on or around any portion of the land in question until 1955, shortly before plaintiff filed his petition.

On the other hand, plaintiff adduced evidence that he rented the land in Section 1 before 1933; that he lived south of the river, almost straight south of the west line in the northeast quarter of Section 1; and that he obtained the legal title thereto in 1933 and had been in possession thereof since that time. In that connection, there is evidence that he had cattle on the land in question before and after the river changed; that he had chopped wood for fuel and posts there every second

year, and every year when he was strong enough to do so, and gave permission for others to do so; that he went upon the land several times every summer and winter for such purposes and other reasons, as did his two sons at different times; that he gave the Loup River Public Power District permission to cut wood thereon for rip-rapping and repairing its dike every year since its construction until about 4 years ago; and that he fenced the land on the north side of the river twice. He fenced it first in 1937 along the north line of Section 1, thence southwest along the line with circles on it referring to the surveyor's plat, and fenced it again in 1954, thereby enclosing the adjacent fraction in Section 36 for which he had received a warranty deed. Thereafter, he again put his cattle on all that land, but defendants tore out the fence and removed his cattle.

There is evidence that it was difficult to put in a fence because six men had to chop their way through the timber and brush, and it took 3 or 4 days to do so. There is evidence that once before 1954, that is in 1951 or 1952, plaintiff saw a few, 5 or 10 cattle on the land, and asked defendant Prososki whose they were, but defendant Prososki replied that he didn't know, maybe the neighbors; that plaintiff then told defendant Prososki he would put up or repair a fence which was down on the west, and rent the land to him for pasturage, but defendant Prososki said he didn't want it, they had plenty of pasture; and that although plaintiff had been on the land several times each year, as had his sons at different times, they never saw or found any footprints or manure or evidence that defendants' cattle had been grazing on the land involved.

The material and relevant evidence aforesaid was corroborated in material respects by employees of the Loup River Public Power District and plaintiff's two sons. We conclude that the issue of adverse possession was a question for the jury.

Defendants complained that the trial court erred in

giving instructions Nos. 4 and 8, and in refusing to give their tendered instructions Nos. 2, 5, 6, 7, 10, 11, 15, and 16. In that connection, we have held that: "Where a party has sustained the burden and expense of a trial and has succeeded in securing the judgment of a jury on the facts in issue, he has the right to keep the benefit of that verdict unless there is prejudicial error in the proceedings by which it was secured.

"Errors sufficient to cause the granting of a new trial must be errors prejudicial to the rights of the unsuccessful party.

"Instructions should be read and construed together, and, if as a whole they state the law correctly, they will be held sufficient, although one or more of them, considered separately, may be subject to just criticism." Wright v. Lincoln City Lines, Inc., 163 Neb. 679, 81 N. W. 2d 170.

In Myers v. Willmeroth, 151 Neb. 712, 39 N. W. 2d 423, we held: "The refusal to give a requested instruction is not error if the subject thereof is substantially and correctly included in the charge of the court to the jury.

"The meaning of an instruction, not the phraseology, is the important consideration, and a claim of prejudice will not be sustained when the meaning of the instruction is reasonably clear.

"When different instructions are given on the same subject, they should be considered together; and if they fairly submit the case, it will not be reversed for indefiniteness or ambiguity in one of the instructions.

"In determining whether or not there was error in a sentence or clause of an instruction, it will be considered with the instruction of which it is a part and the other instructions, and the true meaning thereof will be determined not from the sentence or phrase alone but by a consideration of all that is said on the subject." See, also, Fimple v. Archer Ballroom Co., 150 Neb. 681, 35 N. W. 2d 680, *infra*. ...

In the light of such rules, we have examined all of the instructions given by the trial court and those tendered by defendants. In doing so, we find that the trial court fully and fairly submitted every material issue to the jury in a manner which could not have been prejudicial to defendants. To discuss defendants' contention further with regard thereto would unduly prolong this opinion and serve no useful purpose.

For reasons heretofore stated, we conclude that the judgment of the trial court should be and hereby is affirmed.

AFFIRMED.

SIMMONS, C. J., participating on briefs.