MONUMENT FARMS, INC., A NEBRASKA CORPORATION, APPELLEE, V. TED DAGGETT, TRUSTEE, ET AL., APPELLANTS.

520 N.W.2d 556

Filed August 2, 1994.    No. A-93-063.

Robert M. Harris and Randall L. Lippstreu, of Harris & Lippstreu, P.C., for appellants.

Roy Hahn, of Hahn Law Office, P.C., for appellee.

SIEVERS, Chief Judge, and CONNOLLY and HANNON, Judges.

CONNOLLY, Judge.

Ted Daggett, Elizabeth Stanko, and Bruce Scott (trustees) appeal individually and as trustees from the trial court's judgment in favor of Monument Farms, Inc. (Monument), in its suit to quiet title to a disputed portion of an island in the North Platte River. After the original platting of the pertinent section of the river in 1878, an island formed in the river at the location in question. One channel of the river flowed north of the island, and the other south. The trial court quieted title in favor of Monument because the disputed land was on Monument's side of the main channel of the river and, in the alternative, because Monument and its predecessors in title had claimed the disputed land by adverse possession. We affirm because the thread of the south channel is the dividing line between the land of the parties, and the disputed land is on Monument's side of the south channel.

## I. FACTS

Based on our de novo review of the record, we make the following factual findings.

### 1. DISPUTED LAND

At issue is the eastern third of an island in the North Platte River. The island is approximately 3 miles east of Scottsbluff, Nebraska. Below is a sketch of the pertinent section of the river as it existed when this case was adjudicated:

The sketch is for illustrative purposes only and does not purport to be accurate or drawn to scale. See *Winkle v. Mitera*, 195 Neb. 821, 241 N.W.2d 329 (1976). We focus our attention on three

manmade structures depicted in the sketch: the dike, the headgate, and the dam. The dike, approximately 3 feet high, consists of steel pilings, granite, car bodies, wood, dirt, and sand. Such structures are commonly utilized to divert the flow of water from one side of a stream to the other. The record indicates that the dike was built for the Castle Rock Irrigation District by Harry F. Berggren & Sons, Inc., in 1953. Castle Rock also owned the headgate and the dam. The headgate is a concrete and steel structure with sliding gates that can be raised to allow river water to flow into Castle Rock's irrigation canal. The dam is a concrete structure that guarantees that the water level is high enough at the headgate to ensure that water will flow through the headgate into the irrigation canal.

Both parties claim their chains of title from original federal government patents to federal government lots in Scotts Bluff County, Nebraska, in Sections 3 and 4, Township 21 North, Range 54 West of the 6th P.M. As indicated above, the section line between Sections 3 and 4 cuts through the island. In this action to quiet title in its favor to the portion of the island east of the section line, Monument argued that the disputed land was part of the property described in Monument's title and that, in the alternative, Monument owned the land by adverse possession. The trustees answered that the land was part of their property and that, in the alternative, they, rather than Monument, owned the disputed land by adverse possession. The portion of the island west of the section line is owned by Nellie Mendenhall and is not at issue.

## 2. EVOLUTION OF THE ISLAND

The original township plat of 1878 does not show any islands in the section of the river where the island now exists. The field notes taken in connection with the original platting also do not mention any islands. A map prepared by Castle Rock in 1913 does not indicate any islands. A map prepared by a federal agency in 1921 shows no islands in the river at the location in question. Mendenhall, who was born in 1905 and grew up on a homestead in Section 4 bordering the river, testified that in her early years, as a little girl, "when you looked clear across [the river] you didn't see a tree or a thing." Although the trustees

asserted in their answer that in 1889 Castle Rock built a diversion dike at the western tip of the island to force water from the main channel, on the north side of the island, to the secondary, south channel, the record definitively shows that there were no islands in the pertinent section of the river through 1921.

From 1909 to 1958, the State of Wyoming built four of five dams on the North Platte River. In Nebraska, the reduced flow of water and the increased control of seasonal flooding allowed the growth of brush and trees in the river and the formation of islands. Mendenhall recalled that trees began to appear in the river before she was married in the mid-1920's. Marjorie Barr, who was born in 1914 and lived near the river as a young girl, testified about riding horseback on the island at issue in the late 1920's. The island at issue appears in aerial photographs of the river from the late 1930's. Mendenhall and Barr, the only two witnesses who observed the river during the period when the island and the north and south channels were formed, testified that the south channel always had carried more water than the north.

At trial, the trustees did not contest the fact, verified by a host of witnesses, that the south channel is the main channel of the river where it flows between Monument's land and the land of the trustees. However, they argued that the thread of the south channel should not be recognized as the proper boundary because Castle Rock interfered with the natural flow of the river by shifting the main flow away from the north channel to the south.

The trustees contended that Castle Rock had initiated diversionary projects upstream from its headgate long before the completion of the dike in 1953, but the record does not support this contention. The minutes of Castle Rock's meetings from July 19 to September 8, 1919, indicate that Castle Rock decided to build a dam adjacent to, and immediately *downstream* from, its headgate. Mendenhall stated repeatedly that she did not remember any diversionary projects at the western end of the island (upstream from Castle Rock's headgate) prior to the one completed in 1953. A licensed surveyor reviewing three aerial photographs of the river taken

in 1938, 1939, and sometime during World War II could not see any evidence of manmade structures in the river at the western end of the island, upstream from the headgate. Other than an acknowledgment by the surveyor that a buildup of sand at the western end of the island, visible in the 1939 photograph, could have been caused by a bulldozer, there is no evidence in the record of Castle Rock's taking action to create a dike or other diversionary structure upstream from its headgate prior to the completion of the dike by Berggren & Sons in 1953.

### 3. ADVERSE POSSESSION

We briefly review the facts pertinent to the issue of adverse possession. Monument's predecessors in title, the Everett family, exercised dominion over the eastern portion of the island, including grazing cattle on it, for more than 10 continuous years. The trustees' predecessors in title, the Jerger family, acknowledged the Everetts' authority over the land on the eastern end of the island. The Jergers did not engage in any activity or make any claims north of their fence that ran along the south bank of the south channel. Occasionally, the Jergers hunted on the eastern end of the island, but always with the permission of the Everetts or their tenants. Monument has paid taxes on the disputed land since purchasing the Everett property in 1976. Ted Daggett's act of posting no trespassing signs on the disputed land in either 1989 or 1990 marked the first assertion of authority over the disputed land by titleholders of property south of the south channel.

### 4. TRIAL COURT'S RULING

The trial court made extensive findings for the record, including the following: The island and the north and south channels were formed independently from, and prior to, Castle Rock's development of the diversionary project at the western end of the island; the south channel had evolved as the main channel; and the thread of the south channel was the boundary between the parties' lands, which meant that the disputed land was on Monument's side of the boundary. The court found that Monument prevailed as well on the issue of adverse possession. Accordingly, the court quieted title to the disputed land in favor of Monument.

## II. ASSIGNMENTS OF ERROR

The trustees argue that the trial court erred in finding that (1) Monument owned the disputed land by accretion because the south channel was the main channel of the river and (2) Monument owned the disputed land via adverse possession.

## III. STANDARD OF REVIEW

An action to quiet title is equitable in nature. See Neb. Rev. Stat. § 25-21,120 (Reissue 1989). In an appeal of an equity action, an appellate court tries factual questions de novo on the record and reaches conclusions independent of the findings of the trial court, provided, where credible evidence is in conflict on material issues of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Mackiewicz v. J.J. & Associates*, 245 Neb. 568, 514 N.W.2d 613 (1994).

A party who seeks to have title in real estate quieted in him on the ground that it is accretion land to which he has title has the burden of proving the accretion by a preponderance of the evidence. *State v. Matzen*, 197 Neb. 592, 250 N.W.2d 232 (1977).

## IV. ANALYSIS

### 1. DETERMINING THE RIPARIAN BOUNDARY

We begin by reviewing the applicable propositions of law.

An owner of land on shore, in the absence of restrictions on his grant, owns to the thread of the stream, and his riparian rights extend to existing and subsequently formed islands. *Krumwiede v. Rose*, 177 Neb. 570, 129 N.W.2d 491 (1964). Where title to an island bounded by the waters of a nonnavigable stream is in one owner and title to the land on the other shores opposite the island is in other owners, the same riparian rights appertain to the island as to the mainland. *Winkle v. Mitera*, 195 Neb. 821, 241 N.W.2d 329 (1976). Where by process of accretion and reliction, or either, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner. *Krumwiede v. Rose, supra.*

Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shoreline out by deposits made by contiguous water; reliction is the gradual withdrawal of the water from the land by the lowering of its surface level from any cause. *Ziemba v. Zeller*, 165 Neb. 419, 86 N.W.2d 190 (1957). Subject to the easement of navigation, riparian owners are entitled to the possession and ownership of an island formerly under waters of the stream as far as the thread of the stream. *Summerville v. Scotts Bluff County*, 182 Neb. 311, 154 N.W.2d 517 (1967). The thread or center of a channel, as the term is employed, must be the line which would give the owners on either side access to the water, whatever its stage might be, and particularly at its lowest flow. *State v. Ecklund*, 147 Neb. 508, 23 N.W.2d 782 (1946). In other words, the thread of the stream is the deepest groove or trench in the bed of a river channel, the last part of the bed to run dry. Where the thread of a stream is the boundary between estates and that stream has two channels, the thread of the main channel is the boundary between the estates. See *Hardt v. Orr*, 142 Neb. 460, 6 N.W.2d 589 (1942). Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel. *Ziemba v. Zeller, supra*. The rule as to the ownership of accretion land remains the same, even though the processes of accretion are caused or accelerated by the construction work of third parties. *Krumwiede v. Rose, supra*. The fact that accretion is due, in whole or in part, to obstructions placed in the river by third parties does not prevent the riparian owner from acquiring title thereto. *Ziemba v. Zeller, supra*.

The trustees concede that the south channel presently is the main channel of the river, the location of the thread of the stream. However, they argue that the south channel should not be recognized as the boundary because the island was formed by avulsion rather than by accretion or reliction. Avulsion is a sudden and perceptible loss of or addition to land by the action of water, or a sudden change in the bed or course of a stream. *Valder v. Wallis*, 196 Neb. 222, 242 N.W.2d 112 (1976).

The trustees' theory of avulsion is based on a resolution

passed by Castle Rock in 1919 which, according to the trustees, called for the construction of an upstream dike for the purpose of diverting water toward Castle Rock's irrigation canal headgate further downstream on the south bank of the river. The trustees argue that this alleged 1919 upstream dike suddenly and simultaneously created, or contributed to the formation of, an island and a new (south) channel that became the thread of the stream. However, as we noted above in part I, "Facts," Castle Rock resolved in 1919 to build a structure adjacent to, and immediately *downstream* from, its headgate. In the sketch, the structure decided on in 1919 is the dam abutting the east end of the headgate at roughly a 60-degree angle. The 1919 dam was not a structure built upstream from the headgate. Contrary to the trustees' allegations, it was not an upstream diversionary structure that caused, or abetted, the formation of the island.

In urging us to recognize the north channel as the boundary, the trustees rely on a line of cases in which the Nebraska Supreme Court has stated that a new main channel will not necessarily displace the previous main channel as the boundary between riparian owners. See, *Valder v. Wallis, supra*; *Durfee v. Keiffer*, 168 Neb. 272, 95 N.W.2d 618 (1959); *State v. Ecklund, supra*. See, also, *Ziemba v. Zeller, supra* (where a stream which is a boundary from any cause suddenly abandons its old and seeks a new bed, such change of channel works no change of boundary, and the boundary remains as it was in the center of the old channel, although no water may be flowing therein). In this line of cases, the court has carved out an exception to the general rule that the boundary between riparian lands follows the thread of the contiguous stream, even if the thread of the stream shifts to a new bed, or from one channel to another. Whether the facts involve a river cutting a new main channel as in *Valder v. Wallis*, or an existing channel supplanting a parallel channel as the thread of the stream as in *State v. Ecklund*, the more sudden and violent the change in the thread of a stream, the more likely the court has been to override the general rule and find that the riparian boundary remains in the thread of the original main channel, even if water no longer flows in that channel.

In effect, the trustees urge this court to find that the actions of Castle Rock precipitated a change in the thread of the stream so sudden and violent that equity requires this court to apply the exception discussed immediately above and recognize the north channel as the riparian boundary between Monument and the trustees. We decline to make such a finding because the record before us does not indicate that such a scenario occurred.

The record shows that Castle Rock first intervened in the river upstream from its headgate in 1953, when Berggren & Sons built the dike at the western edge of the island across the entrance to the north channel. The testimony of Nellie Mendenhall and aerial photographs of the river prior to 1953 did not indicate the presence of any diversionary structures in the river at the location in question prior to the construction of the dike by Berggren & Sons in 1953. By the time Castle Rock acted to divert water from the north channel to the south channel, the south channel already had developed as the main channel of the river in that location. The thread of the stream already existed in the south channel by the time the Castle Rock dike was built in 1953.

There is no evidence in the record that Castle Rock caused a sudden and violent change in the river resulting in the formation of the island. There is no evidence that the formation of the island was anything other than a gradual process of accretion and reliction. Furthermore, there is no evidence that the north channel ever was the main channel, and thus no evidence of a sudden and violent shift in the thread of the stream from the north channel to the south channel.

On de novo review, we find by a preponderance of the evidence that the island was formed by a combination of accretion and reliction, not by avulsion. It is impossible to designate as the original channel either the north or the south. The channels developed simultaneously as the island emerged in the middle of the river, with the south channel becoming the main channel. The land at issue is on Monument's side of the thread of the south channel, the riparian boundary between Monument's land and the land of the trustees.

## 2. ADVERSE POSSESSION

Although our resolution of the riparian boundary renders moot the issue of whether Monument claimed the disputed land via adverse possession, we briefly touch on this assignment of error.

The burden is on one who claims title by adverse possession to prove by a preponderance of the evidence that he has been in actual, continuous, exclusive, notorious, and adverse possession under claim of ownership for the statutory period of 10 years. *Nennemann v. Rebuck*, 242 Neb. 604, 496 N.W.2d 467 (1993). Rather than recite again the pertinent facts on this issue, we refer the reader to part I(3) above. Upon de novo review of the record, we find by a preponderance of the evidence that Monument proved its claim of adverse possession.

## V. CONCLUSION

For the reasons discussed above, we affirm the judgment of the trial court quieting title to the disputed land in favor of Monument.

AFFIRMED.