765 N.W.2d 227 (2009)
17 Neb. App. 400
Thomas E. BABEL, appellant,
v.
Jerry SCHMIDT et al., appellees.
No. A-08-089.
Court of Appeals of Nebraska.
March 3, 2009.
*230 David A. Domina, Omaha, of Domina Law Group, P.C., L.L.O., and Patrick J. Nelson, Kearney, of Jacobsen, Orr, Nelson, Lindstrom & Holbrook, P.C., L.L.O., for appellant.
Jerom E. Janulewicz, of Mayer, Burns, Koenig & Janulewicz, Grand Island, for appellees.
INBODY, Chief Judge, and SIEVERS and MOORE, Judges.
SIEVERS, Judge.

INTRODUCTION
This appeal involves conflicting claims of ownership to riparian land in the form of islands located between the banks of the Platte River in Merrick County, Nebraska. In a sentence, the resolution of the dispute depends upon whether the legally effective boundary is the present "thread of the stream" or whether there was an avulsive event proved, which, while changing the location of the thread of the stream, would not change the legal boundary between the owners from what it was at the time of the avulsive event. Thomas E. Babel, the landowner on the south bank of the Platte River, appeals the decision of the district court for Merrick County that found that the boundary between his property and the property of the north bank landowners (the heirs at law of Arthur Schmidt, hereinafter collectively the Schmidts) was created by avulsion. Consequently, the district court found that the boundary was as alleged by the Schmidts in their counterclaims, filed pursuant to Neb.Rev.Stat. § 34-301 (Reissue 2008), rather than the thread of the stream. We reverse the district court's order, because we find that the Schmidts failed to prove an avulsive *231 event by the requisite proof. As a result, the boundary between the lands of Babel and the Schmidts is determined by the current location of the thread of the stream.

FACTUAL BACKGROUND
Babel and the Schmidts own property on the south bank and the north bank, respectively, of the Platte River near Chapman in Merrick County, and as a result, they own the riparian lands consisting of islands between their respective banks of the Platte River. Who owns what island land is the crux of the lawsuit.
So that our factual recitation is more understandable, we begin by defining the legal concept of the "thread of the stream." In Monument Farms, Inc. v. Daggett, 2 Neb.App. 988, 995, 520 N.W.2d 556, 562 (1994), we said:
The thread or center of a channel, as the term is employed, must be the line which would give the owners on either side access to the water, whatever its stage might be, and particularly at its lowest flow. State v. Ecklund, 147 Neb. 508, 23 N.W.2d 782 (1946). In other words, the thread of the stream is the deepest groove or trench in the bed of a river channel, the last part of the bed to run dry.
We point out at this juncture that the parties have stipulated to the current location of the thread of the stream in the area of this boundary dispute. Babel is the record title owner of "Island No. 5," which is located to the south of the thread of the stream and to the south of "Island No. 3," to which the Schmidts are record title owners. In this litigation, the Schmidts lay claim to a portion of Island No. 5, as set forth in their counterclaims upon which the case was tried. Because the maps, surveys, and photographs which are crucial to the case do not lend themselves to effective narrative, we have attached as appendix A to our opinion a reproduction of exhibit 59 (with orienting labels affixed by Babel for briefing purposes that we have "borrowed" from Babel's brief) in an effort to more effectively orient the reader. Appendix A is an aerial photograph of the river, its various channels, and the two islands in dispute taken near the time of trial.
On March 8, 2006, Babel filed suit against the Schmidts, seeking to establish the boundary for Island No. 3 and Island No. 5. The Schmidts answered and filed counterclaims to establish the western and southern boundaries of their property pursuant to § 34-301. Four days before trial, Babel dismissed his complaint without prejudice, and the case proceeded to trial solely on the Schmidts' counterclaims, filed May 15 and July 10, 2006. In addition to stipulating to the current location of the thread of the stream, the parties stipulated that Babel is the record title owner of that "part of Island 5 in Section 12, Township 12 North, Range 7 West of the 6th P.M., in Merrick County, Nebraska, containing 6 and 26 hundredths acres, more or less, and accretions thereto of Island No. 5." The parties also stipulated that the Schmidts were the record title owners of
Island No. 3 located [(a)] partially in Section 1, Township 12 North, Range 7 West of the 6th P.M.[;] (b) ... partially in Section 6, Township 12 North, Range 6 West of the 6th P.M.; and (c) partially in Section 31, Township 13 North, Range 6 West of the 6th P.M., all in Merrick County, Nebraska, and all accretion land deriving from and adjacent to such Island No. 3.
Babel alleged that the boundary separating his property from the Schmidts' is located at the current thread of the stream of the main channel of the Platte River. The Schmidts sought to establish that *232 their alleged property line was the original boundary of Island No. 3 and its meanders prior to an avulsive event and that such property line ran along the south side of Island No. 5 at the place where the thread of the stream was previously located, meaning that the Schmidts would own considerably more land than provided for in their legal descriptionand Babel would own less. The parties agreed that neither would harvest or cut timber on the disputed land during the pendency of the lawsuit, including any appeal, and that any claim for damages resulting from improper cutting of timber would be resolved at a later time.
This boundary dispute arose in late 2005 or early 2006 after Charles Schmidt employed Jim Graves, the Merrick County surveyor, to conduct a survey on Island No. 3 after Arthur died, so as to enable the Schmidt family to settle Arthur's estate. Graves discovered that there were significant discrepancies between the legal descriptions of the islands and the cadastral map that had been prepared in 1988. Original surveys of the area were conducted by the Government Land Office (GLO) in 1858, 1862, 1865, and 1866. Additional surveys had been conducted on the properties, including the islands, in 1921 and 1932. Graves determined that the GLO surveys of Island No. 3 differed considerably from all later surveys as well as from his own 2006 survey.
Prior to Graves' 2006 survey and his discovery of differences from the earlier surveys, neither the Schmidts nor Babel had been aware of a boundary dispute. In 1992, Babel fenced a portion of Island No. 3, including a portion north of the boundary that the Schmidts asserted in this litigation. Until 2006, Babel did not receive any notice from Arthur (or any of his heirs) that the boundary between the two islands or the ownership thereof was in dispute. The part of Island No. 3 that lies to the north of the stipulated thread of the stream, which part is indisputably owned by the Schmidts, was conveyed by quitclaim deed to Todd and Charlene Vanhousen in 2006. Charles testified that the Vanhousens planned to purchase any additional property from the Schmidts which resulted from this litigation and that the Vanhousens had entered into a written contract with the Schmidts to such effect.

DISTRICT COURT DECISION
A bench trial was held on the Schmidts' counterclaims on September 18, 2007, in the district court for Merrick County. The trial court issued its memorandum opinion and order on December 19. The court stated that the two issues before it concerned (1) the configuration of Island No. 3 on the original GLO surveys and (2) whether the Schmidts presented sufficient evidence for the court to find that the channel to the north of the disputed property was created by a sudden act constituting avulsionmeaning, we would add, that the boundary would not be the stipulated thread of the stream, but, rather, would be the channel flowing along the southern boundary of Island No. 5. The court stated, and neither party disagrees, that the disputed portion is highlighted in yellow on exhibit 47, which can be described as the easternmost tip of Island No. 5, a triangle measuring approximately 4,600 feet in length and 1,400 feet at its widest point. The district court concluded that the change in the main channel to the north resulted from a sudden act constituting avulsion and found generally in favor of the Schmidts, declaring the legal boundary to be that which they alleged in their counterclaims. In its order, the court remarked, "What [the avulsive] act was is in some question, but the nature of the evidence is such that the channel was not changed by accretion." Babel timely appealed *233 the district court's ruling to this court.

STANDARD OF REVIEW
[1, 2] An action to ascertain and permanently establish corners and boundaries of land under § 34-301 is an equity action. Anderson v. Cumpston, 258 Neb. 891, 606 N.W.2d 817 (2000). In an equity action, an appellate court reviews the record de novo and reaches an independent conclusion without reference to the conclusion reached by the trial court, except that where credible evidence is in conflict, the appellate court will give weight to the fact that the trial court saw the witnesses and observed their demeanor while testifying. See Sila v. Saunders, 274 Neb. 809, 743 N.W.2d 641 (2008).

ASSIGNMENTS OF ERROR
Babel assigns as error the following actions of the district court: (1) finding avulsion had been proved, (2) finding that any part of the southern meanders of Island No. 3 are located south of the main channel, and (3) finding the southern and western boundaries of the Schmidts' land as alleged in the Schmidts' counterclaims and failing to find and determine the southern boundary of the Schmidts' land as alleged in Babel's replies and exhibit 43.

ANALYSIS
The core question before us in this appeal, remembering that our review is de novo on the record, is whether there was sufficient evidence adduced by the Schmidts to show that avulsion occurred that altered the course of the river from the channel south of Island No. 5 to the current thread of the stream located between Island No. 3 and Island No. 5 sometime between the 1858 GLO survey and the 1921 survey of Island No. 3, the timeframe asserted during oral argumentalthough we note that the Schmidts' answers to interrogatories in evidence would extend the time period to 1938. However, in the final analysis, whether the end of the timeframe is 1921 or 1938 is of no consequence. In conjunction with our standard of review, we note that there really are no disputed facts, beyond the ultimate determinate fact of whether there was an avulsive event. We begin with the legal principles that guide our analysis.
[3-5] The law of avulsion and accretion is well settled in Nebraska. Avulsion is a sudden and perceptible loss of or addition to land by the action of water, or a sudden change in the bed or course of a stream. Monument Farms, Inc. v. Daggett, 2 Neb. App. 988, 520 N.W.2d 556 (1994). Avulsion is a change in a stream that is violent and visible and arises from a known cause, such as a freshet or a cut through which a new channel has formed. See Conkey v. Knudsen, 141 Neb. 517, 4 N.W.2d 290 (1942), vacated on other grounds 143 Neb. 5, 8 N.W.2d 538 (1943). On the other hand, accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shoreline out by deposits made by contiguous water; reliction is the gradual withdrawal of the water from the land by the lowering of its surface level from any cause. Monument Farms, Inc. v. Daggett, supra. In summary, the changes wrought by accretion versus avulsion involve processes that are markedly different, and each process has a different consequence for the boundary between the land-owners on opposite banks of the river.
[6-9] Where the thread of the main channel of a river is the boundary line between two estates and it changes by the slow and natural processes of accretion and reliction, the boundary follows the channel. Ziemba v. Zeller, 165 Neb. 419, 86 N.W.2d 190 (1957). Accretion, regardless *234 of which bank to which it adds ground, leaves the boundary still at the center of the channel. See, Anderson v. Cumpston, 258 Neb. 891, 606 N.W.2d 817 (2000); Lienemann v. County of Sarpy, 145 Neb. 382, 16 N.W.2d 725 (1944); Conkey v. Knudsen, supra; Monument Farms, Inc. v. Daggett, supra. On the other hand, avulsion has no effect on boundary, but leaves it in the center of the old channel. See Lienemann v. County of Sarpy, supra. See, also, O'Connor v. Petty, 95 Neb. 727, 146 N.W. 947 (1914) (holding that change by avulsion in main channel of Missouri River does not change boundary between states of Iowa and Nebraska). The applicability of the law of avulsion is not dependent upon the navigability of the waterway. Anderson v. Cumpston, supra.
[10, 11] A party who seeks to have title in real estate quieted in him on the ground that it is accretion to land to which he has title has the burden of proving the accretion by a preponderance of the evidence. State v. Matzen, 197 Neb. 592, 250 N.W.2d 232 (1977). The burden to show that the channel of the river changed by avulsion obviously would be the same. Babel argues that there is a presumption of accretion if avulsion is not shown. However, we disagree that such presumption exists under Nebraska law and find the reasoning of United States v. Wilson, 433 F.Supp. 57 (N.D.Iowa 1977), on this point persuasive where the court applied Nebraska law to land altered by the changing course of the Missouri River.
Past cases have illustrated the sorts of events that constitute avulsion. See, Anderson v. Cumpston, supra (party admitted that change in thread of Platte River was brought about suddenly by artificial structures and diversion, thus doctrine of avulsion applied and boundary remained in center of old channel); Ziemba v. Zeller, supra (based on photographs and eyewitness reports, construction of diversion dam and riprapped dike some 700 to 800 feet long, which shut off main channel, constituted avulsion); Ingraham v. Hunt, 159 Neb. 725, 68 N.W.2d 344 (1955) (flash floods that suddenly, violently, and visibly moved channel of river far toward north of original channel can be considered avulsion); Conkey v. Knudsen, supra (evidence was sufficient to show ice gorge created by spring floods in 1910 altered course of Missouri River and constituted avulsion, not accretion). It is noteworthy that no such similar events as described in the foregoing cases are identified in the evidence as the avulsive event allegedly at work in the present case.
We first deal with Babel's argument that the Schmidts conclusively conceded that the channel north of Island No. 5, which is the agreed-upon current thread of the stream, was not changed by avulsion. The Schmidts were served with interrogatories, and in response to a question about the manner, nature, and date of any avulsive act that changed the location of the channel of the Platte River, the Schmidts answered by filing some responses in June and some in August 2006. The response upon which Babel's argument is premised is as follows: "The location of the channels of the Platte River presently carrying water located north of the East Half of Island Number 5 has not changed location by avulsion. It has, however, changed in width over time due to changes both natural and man-made." There can be no question that the above answer is an admission, which cuts against the Schmidts' central premise that the ownership of the contested island land is determined by an avulsive event. When asked on cross-examination at trial, Charles stated that this statement was accurate to the best of his knowledge and belief at the time it was made. In the supplemental response to *235 interrogatories submitted by Charles on April 26, 2007, he adds the following to his previous response:
Island No. 3 was bisected by a channel as a result of an avulsive act, of indefinite or unknown origin, that occurred after the GLO surveys of Island No. 3 and prior to July 23, 1938. Since that date, upstream changes in the river, both natural and man-made, have caused this channel and others to change over time such that at the present time this channel now contains the thread of the stream of the Platte River.
[12, 13] Babel claims, without citation of authority, that the first interrogatory answer is, in effect, a conclusive admission by the Schmidts that there was no avulsion. Generally, admissions made in pleadings are taken as proof of the fact alleged and thereby waive or dispense with the need to produce evidence of that fact. Brunges v. Brunges, 255 Neb. 837, 587 N.W.2d 554 (1998). However, we believe a party may introduce evidence in conflict with their prior admission unless doing so runs afoul of the rule from Momsen v. Nebraska Methodist Hospital, 210 Neb. 45, 313 N.W.2d 208 (1981), which holds that where a party without reasonable explanation testifies to facts materially different concerning a vital issue, the change clearly being made to meet the exigencies of pending litigation, such evidence is discredited as a matter of law and should be disregarded. See, also, Insurance Co. of North America v. Omaha Paper Stock, Inc., 189 Neb. 232, 202 N.W.2d 188 (1972). From our experience, we believe it is fair to say that while the Momsen rule is well known and often asserted, it is actually infrequently applied.
[14, 15] Thus we assume that Babel would have us apply the Momsen rule and disregard the Schmidts' evidence of avulsion from Dr. Robert Joeckel, which evidence we discuss in detail later. The important considerations in discrediting testimony as a matter of law are that the testimony pertains to a vital point, that it is clearly apparent the party made the change to meet the exigencies of the pending case, and that there is no rational or sufficient explanation for the change in testimony. Levander v. Benevolent and Protective Order of Elks, 257 Neb. 283, 596 N.W.2d 705 (1999). We find that there is a rational and sufficient explanation for the change in position from the first interrogatory answer of "no avulsion" to the supplemental response to the interrogatory and evidence at trial from which the Schmidts argue that they had proved avulsion. The interrogatory answer was a layperson's answer, whereas the evidence that arguably proves avulsion is the product of expert investigation done by Joeckel after the first interrogatory answer. We find that there is a reasonable explanation for the change, that the first interrogatory answer is not conclusive, and that the other evidence of avulsion offered by the Schmidts is not discredited as a matter of law under Momsen v. Nebraska Methodist Hospital, supra. Consequently, the practical effect is simply that the first interrogatory answer is considered, along with the Schmidts' evidence of avulsion, in our de novo review of the record.
[16] The only evidence as to whether an avulsive act altered the course of the river came from Graves and Joeckel. Graves was asked if he had an opinion, based on his training as a surveyor, as to why there would be a channel currently across Island No. 3 that is not indicated in the GLO survey of 1858. In response, Graves said:
[T]here must have been a smallera small stream that went through there and something has, erosion or whatever, caused through the time since it was *236 surveyed untileven from the time they originally surveyed until 1921, it actually hadmust have grown quite a bit....
And there's somethingprobably was a small island, small channel through there and something made it grow to be a larger one, got more water at that point than it had or stopped going in different directions. Some reason that all of a sudden it became a lot because if it was that big, it should have showed up on the GLO.
Graves also testified that in his personal opinion, not as a surveyor, but, rather, as a person familiar with the river, he did not know exactly what caused the river to change course but suspected a flood or ice jam. Graves' comments about the possibility that a small stream existed and the occurrence of a flood or ice jam are not based upon personal knowledge, are not expert opinion, and are clearly mere speculation. Graves' unchallenged testimony shows that the location of the thread of the stream has changed, making Babel's Island No. 5 bigger and the Schmidts' Island No. 3 smaller. However, in order for the Schmidts to prevail on their counterclaimsmeaning that the boundary is not the thread of the stream the Schmidts' burden, under the legal principles we have outlined above, is to prove that the change occurred by avulsion. Graves' testimony simply does not prove avulsion, although it does show a change in the course of the river, but at an unknown point in time.
Finally, Graves testified that the thread of the stream was widening over time, from 138.7 feet in 1921 to over 300 feet in 2006. To the extent that this evidence is probative of anything, to us it supports the notion of change in the thread of the stream by a gradual processthe hallmark of accretion, rather than avulsion.
We turn next to the Schmidts' claim that the testimony of Joeckel, an associate professor of soil science and geology at the University of Nebraska-Lincoln, establishes that the change in the course of the river is due to avulsion. Joeckel testified about two soil samples that he took from Island No. 5 by digging holes with a spade and one sample taken from Island No. 3 in the same fashion. The samples were taken from the center of the northeastern portion of Island No. 3 (labeled "A" on the map in exhibit 46), from the northern edge of Island No. 5 near the thread of the stream (labeled "B" on the map in exhibit 46), and from the center of the northeastern part of Island No. 5 (labeled "C" on the map in exhibit 46). Joeckel testified that the soil profile of site A was broadly similar to site B and that both sites had thick "A and C horizons" and relatively no "B horizon." A soil horizon, according to Joeckel's testimony, is a layer within a soil sample that exists because of differences in chemical, physical, and biological processes at different depths below the land surface of the soil, measured from the surface of the land downward. In reference to the soil sample from site B, Joeckel testified:
These soils are all developed in river sediment. So we kept digging, basically, as deep as we could go by hand with the spade, down to 85 centimeters. So no evidence for there being more than one unit of sediment being deposited on that site, hence, came to the conclusion that the soil was developed in a single episode, single length of time after deposition had ceased at the site.
As to the soil sample from site C, Joeckel stated that it was obviously a different profile from either site A or B. Joeckel testified that site C had much more geomorphic activity and episodes of sedimentation and soil development. He stated that site C had been subject to more regular *237 flooding and sedimentation events than either site A or B, which had been subject to fewer, if any, severe floods. Joeckel did not opine that any particular soil samples resulted from accretion or avulsion. When asked whether the soil profile at site C was consistent with accretion land, Joeckel limited his testimony to discussion of the thickness of the soil horizons at each site and his conclusions that site C had more episodes of sedimentation and soil development than either site A or B.
The Schmidts argue Joeckel's testimony about the three soil samples shows that site C was formed by accretion and that an avulsive event occurred at some point to separate site A from site B, because the two sites are now located on different islands, whereas, according to the Schmidts' argument, they were once part of the same island. The Schmidts further argue that Joeckel's testimony about the soil samples shows the thread of the stream changed in a dramatic fashion so as to have bisected the original island and that as such, they have shown an avulsive event that requires the property boundary to be located along the original thread of the stream. Consequently, according to the Schmidts' argument, the original boundary of Island No. 3 and its southern meanders, which corresponds with the channel south of Island No. 5 as alleged by the Schmidts, is the effective boundary between the lands of Babel and the Schmidts, rather than the current thread of the stream.
The problem is that Joeckel did not testify to the conclusions that the Schmidts argue. While Joeckel did testify to finding differences in the soil at sites A and B when compared to site C, he did not offer an opinion as to when the soil patterns he found at the three sites were formedparticularly in relation to the surveys in evidence that go back as far as 1858. Joeckel did testify that the soil pattern he observed at sites A and B were likely created in "a single episode, single length of time after deposition had ceased at the site." Whether the land in question was identifiable as having remained intact through the substantial change in the river has been seen as relevant to avulsion. See, United States v. Wilson, 433 F.Supp. 57 (N.D.Iowa 1977); Jeffrey v. Grosvenor, 261 Iowa 1052, 157 N.W.2d 114 (1968). While we see the evidence regarding the soils at sites A and B as supporting the avulsion theory to a degree, it does not carry the Schmidts' burden of proof by itself. We so conclude because there is no evidence as to when such "single episode" occurred, what caused it, or whether a "single episode" in the language of soil science, the basis upon which Joeckel testified, has the same hallmarks as the legal concept of avulsion, which requires a sudden and violent change in the course of the river. The significance of the passage of time, obviously an important factor in determining whether avulsion occurred because of the requirement of "suddenness," is more equivocal with respect to accretion. For example, in the instance of the Missouri River, accretion has been described as being either rapid or gradual, but avulsion was said to be characteristically sudden and rapid. See, United States v. Wilson, supra; Jeffrey v. Grosvenor, supra. No evidence was offered which would enable a fact finder to say what the avulsion event was, how and why it occurred, and when it occurredno particular day, month, year, or even decade being identifiable from the evidence. And, of course, it follows from the foregoing that no one testified to witnessing the event, nor was any historical record profferedevidence that would clearly help satisfy the "perceptible" requirement for an avulsive event.
[17] We have previously rejected the speculation of the surveyor, Graves, about *238 a "possible ice jam" as simply not probative. Thus, we are left with Joeckel's testimony that sites A and B, now separated from one another by the thread of the stream, have similar soil composition, but which is different from that found at site C. From this we are to conclude that soil samples from sites A and B evidence avulsion and thereby to infer that an avulsive event changed the course of the river, causing the thread of the stream to now flow between Island No. 3 and Island No. 5 as depicted on appendix A, whereas before such event, the thread of the stream was to the south of its present location. The Schmidts' basic premise seems to be that they disproved accretion at sites A and B, that Babel did not prove accretion there, and that thus the change in course of the river had to have been by avulsion. This seems an apt point to recall that when asserting a real estate ownership or boundary claim, a party must prevail, if at all, on the strength of his own title, and not on the perceived weakness in the title of others. See Dugan v. Jensen, 244 Neb. 937, 510 N.W.2d 313 (1994).
[18] Therefore, the burden is on the Schmidts to show that an avulsive event did occur. It is clear that the law defines such an event as sudden and perceptible. See Monument Farms, Inc. v. Daggett, 2 Neb.App. 988, 520 N.W.2d 556 (1994) (avulsion is sudden and perceptible loss of or addition to land by action of water, or sudden change in bed or course of stream). See, also, Conkey v. Knudsen, 141 Neb. 517, 4 N.W.2d 290 (1942) (avulsion is change in stream that is violent and visible and arises from known cause, such as freshet or cut through which new channel has formed), vacated on other grounds 143 Neb. 5, 8 N.W.2d 538 (1943).
These various elements that constitute the hallmarks of an avulsive event simply are absent from the evidentiary record. The district court did not make a finding of a sudden, violent, perceptible, and known event that changed the course of the river at the pertinent location, but, rather, relied on Joeckel's characterization of the soil samples to find that avulsion had occurred. This sparse evidencethat, at best, merely suggests the possibility of avulsion, but of an unknown nature, from an unknown cause, and occurring at an unknown time between 1858 and either 1921 or 1938is simply insufficient to carry the Schmidts' burden of proving that the change in the river's course occurred from avulsion. As a result, we reverse the trial court's finding in favor of the Schmidts on their counterclaims, as well as reversing its declaration that the boundary between the lands of Babel and the Schmidts is as set forth in exhibit 45.
[19] Finally, we address the Schmidts' claim that Frank v. Smith, 138 Neb. 382, 293 N.W. 329 (1940), applies as an exception to the law of avulsion and accretion, which exception they assert supports the district court's decision. This exception applies when the river changes its main channel not by excavating, passing over, and then filling the intervening place between the old channel and the new channel, but by flowing around the intervening land where the change to the new channel results from an increase year to year in the amount of water flowing in the new channel. Id. The law then requires that the boundary line remain in the old channel rather than the new channel as long as the old channel remains a running stream. Id. In State v. Ecklund, 147 Neb. 508, 23 N.W.2d 782 (1946), the Nebraska Supreme Court found the exception to the law of accretion and avulsion detailed in Frank v. Smith, supra, to apply to a boundary dispute over lands bordering the North Platte River. In Ecklund, numerous farmers testified that the north channel had originally *239 carried most of the water, but after dams had been built upstream, the south channel began to have more flow and should be considered the thread of the stream. The court held:
In view of the evidence in the record, and in the light of the law as set out herein, we have reached the conclusion that, while the change of the main channel of the North Platte River in section 8, from the north side to its present location on the south side, may have been a gradual change throughout a space of at least 40 years, yet the thread of the stream, flowing on the north side when each of the parties hereto secured their land, did not gradually move over the subsequently formed intervening lands that were formed to the south thereof. However, the south branch of the river flowing south of Ware Island did finally become the main channel, but this was subsequent to the formation of the land herein involved, and the true boundary line between the respective riparian owners remains the line of the thread of the stream where it formerly ran in the north channel.
State v. Ecklund, 147 Neb. at 523, 23 N.W.2d at 790. A similar holding was reached in Valder v. Wallis, 196 Neb. 222, 242 N.W.2d 112 (1976), where the course of the Missouri River was altered by the U.S. Army Corps of Engineers' construction of dikes, which moved the river westward and placed a parcel of land that had been in Burt County, Nebraska, on the Iowa side of the river.
Whether the facts involve a river cutting a new main channel as in Valder v. Wallis, or an existing channel supplanting a parallel channel as the thread of the stream as in State v. Ecklund, the more sudden and violent the change in the thread of a stream, the more likely the court has been to override the general rule and find that the riparian boundary remains in the thread of the original main channel, even if water no longer flows in that channel.
Monument Farms, Inc. v. Daggett, 2 Neb. App. 988, 996, 520 N.W.2d 556, 563 (1994). However, in cases where this exception has been applied, there was ample evidence that the river did in fact change course in a sudden and violent manner, as well as evidence as to how that change took place. That is not the case here. There is only Graves' speculation of an ice jam as to how and why the river changed course, and this is insufficient. We have no evidence in the record that the change in the river which allegedly bisected Island No. 3, as surveyed in the 1850's and 1860's, was sudden or violent or that the original channel was supplanted by the current thread of the stream. We therefore decline to apply the exception in this case because, based upon the record, we cannot say that the river changed in such a way as to warrant the exception in Frank v. Smith, 138 Neb. 382, 293 N.W. 329 (1940), to apply.
[20-22] Now that we have determined that the Schmidts have failed to sustain their burden of proof, we must determine the location of the boundary to separate the Schmidts' land from Babel's. The location of the thread of the stream is not in dispute in this case. The parties agreed that the current thread of the stream runs along the north side of Island No. 5. Graves testified that he determined the current thread of the stream to be the channel north of Island No. 5 instead of the channel south of Island No. 5, because it was "a lot deeper and a lot wider, carried a lot more water than the one that [one of the attorneys for the Schmidts] had showed which was the south channel, the clear south channel of the Platte River." And the parties ultimately stipulated to *240 the present location of the thread of the stream. Under Nebraska law, title to riparian lands runs to the thread of the contiguous stream. Anderson v. Cumpston, 258 Neb. 891, 606 N.W.2d 817 (2000). The thread, or center, of a channel is the line which would give the landowners on either side access to the water, whatever its stage might be and particularly at its lowest flow. Id. The same principles in setting the boundary at the thread of the stream are applicable to islands within the river. Where title to an island bounded by the waters of a nonnavigable stream is in one owner and title to the land on the other shores opposite the island is in other owners, the same riparian rights appertain to the island as to the mainland. Winkle v. Mitera, 195 Neb. 821, 241 N.W.2d 329 (1976). Because we find the Schmidts have not proved, by a preponderance of the evidence, that the thread of the stream changed by avulsion or that the exception set forth in Frank v. Smith, supra, and State v. Ecklund, 147 Neb. 508, 23 N.W.2d 782 (1946), applies, the boundary between the riparian lands of Babel and the Schmidts is the stipulated current thread of the stream as alleged in paragraph 7 of exhibit 77. We remand the cause to the district court with directions to make such finding establishing the boundary.

CONCLUSION
The order of the district court is hereby reversed, and the boundary is determined to be as alleged in paragraph 7 of Babel's petition, in evidence as exhibit 77. The cause is remanded to the district court for entry of judgment establishing the boundary as set forth in our opinion.
REVERSED AND REMANDED WITH DIRECTIONS.

*241 APPENDIX A